**UNITED STATES of America**

v.

**Ronald Louis HUMPHREY and Truong Dinh Hung, Defendants.**

**Crim. No. 78–25–A.**

United States District Court,
E. D. Virginia,
Alexandria Division.

March 30, 1978.

William B. Cummings, U. S. Atty., Alexandria, Va., David R. Homer, Washington, D. C., James R. Hubbard, Alexandria, Va., for the United States.

Marvin D. Miller, Alexandria, Va., Michael E. Tigar, Washington, D. C., for defendant Hung.

Warren L. Miller, Mark W. Foster, Moore & Foster, Roger E. Zuckerman, Zuckerman & Spaeder, Washington, D. C., for defendant Humphrey.

## MEMORANDUM OPINION

BRYAN, District Judge.

The Court, on March 21, 1978, took under advisement both defendants' Motion to Suppress Electronic Surveillance and Motion to Suppress No. 3 (Physical Seizures).

*Motion to Suppress Electronic Surveillance*

These motions grew out of government monitoring of defendant Hung's telephone on a 24-hour basis, the installation of a microphone in Hung's apartment (2000 F Street, Apt. 201), and the installation of a television camera in defendant Humphrey's office in the United States Information Agency (USIA).

Certain details of the surveillance are not in dispute. Neither side contends that judicial approval was ever sought in connection with the three kinds of surveillance undertaken. The defendants do not dispute that the surveillance was ordered either by the President of the United States, or the Attorney General acting pursuant to a Presidential delegation.

After two days of testimony the Motion to Suppress Electronic Surveillance was argued to the Court March 21, 1978. Counsel for defendant Humphrey suggested a three-pronged analysis at the beginning of his argument, which the Court adopts:

I. Is a warrant required whenever the President, or the Attorney General acting pursuant to Presidential delegation, desires to electronically eavesdrop in cases involving foreign affairs or foreign threats to the national security? [1]

II. If the answer to the first question is "no," was the narrow foreign intelligence gathering exception to the warrant clause recognized in *United States v. Butenko,* 494 F.2d 593 (3rd Cir. 1974), and *United States v. Brown,* 484 F.2d 418 (5th Cir. 1973), present in the instant case?

III. Regardless of the answers to I and II, were the reasonableness requirements of the Fourth Amendment (independent of the warrant requirement and Title III of the Omnibus Crime Control Act of 1968, 18 U.S.C. § 2511(3) (hereinafter Title III) met?

The discussion will first address the standard of review utilized and then follow the order of the questions posed above.

■ The government argues that the Court should adopt the clearly erroneous standard of review contained in the proposed Foreign Intelligence Surveillance Act. Whatever standard of review is adopted, the Court finds that the initial

---

1. The government does not contend that the Fourth Amendment is inapplicable to the circumstances of this case.

determination of the Attorney General that this investigation was a foreign intelligence investigation is supported by, at least, substantial evidence in the record. Moreover, even considered on a *de novo* basis, the Court makes the same factual determination.

■ The government further argues that the Court should defer to the Attorney General's expertise in his judgment that the investigation continued to be primarily a foreign intelligence investigation until January of 1978, when the decision to indict was made, and that this judgment should be upheld unless clearly erroneous. No support save the proposed Foreign Intelligence Surveillance Act is cited for this proposition. The Court feels that whether the focus of an investigation utilizing surveillance undertaken without a judicial warrant has shifted from primarily foreign intelligence gathering is a *de novo* determination to be based, as here, on evidence adduced at the hearing. The Court treats the question as a fact to be determined just as any other fact.

## I.

The question of the applicability of the Fourth Amendment's warrant clause to electronic surveillance conducted under the Presidential powers in the area of foreign affairs, and more specifically foreign intelligence gathering, has not been decided by the Supreme Court. In *United States v. United States District Court (Keith)*, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972), the Supreme Court held that an executive electronic surveillance, though justified as necessary to protect the nation from threats to domestic security, was not an exception to the Fourth Amendment warrant requirement. *Id.* at 323–24, 92 S.Ct. 2125. The Court expressed no opinion on whether identical considerations would compel a warrant for surveillance aimed at obtaining information relating to the foreign aspects of the national security.[2]

■ The Court concludes that, under traditional Fourth Amendment analysis, the United States is not required to apply for a warrant whenever the President, or the Attorney General acting at the President's designation, feels it necessary to electronically eavesdrop in his conduct of foreign affairs.[3] The Supreme Court in *Keith* inquired whether a warrant would better protect privacy and free expression, and second, whether imposing the warrant requirement would unduly frustrate the government's efforts to protect its security. This Court, as did the Court in *Keith,* answers the first *Keith* inquiry, whether a warrant would better protect privacy and free expression, in the affirmative. It is the second prong of the *Keith* inquiry, the frustration inquiry, that gives this Court pause. While it may not always, or often, be the case that compliance with the warrant requirement would impose a burden on the government, the facts of this case support the government's contention that no existing warrant procedure can be reconciled with the government's need to protect its security and existence. While counsel for the defendant suggested in oral argument that a warrant procedure that does not follow the dictates of Rule 41, Fed.R. Crim.P., or Title III can be used, the Court

---

**2.** The Court adopts in this discussion the distinction between domestic and foreign threats to national security drawn by the plurality in *Zweibon v. Mitchell,* 170 U.S.App.D.C. 1, 516 F.2d 594 (1975) (en banc), *cert. denied* 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976): domestic security surveillance is that undertaken in response to threats to the structure or existence of the government which originate directly from domestic organizations which are neither agents of nor acting in collaboration with foreign powers, while foreign security surveillance is a response to threats to the structure

or existence of the government which emanate directly or indirectly from a foreign power. 170 U.S.App.D.C., n. 42 at 20, 516 F.2d, n. 42 at 613.

**3.** Defendants have asserted that the government did not follow its own regulations governing the procedures under which this surveillance took place. The Court has examined the documents in Appendix B to the government's Opposition to the Motion to Suppress and concludes that the government did follow the pertinent regulations and procedures.

rejects this. Title III, by its terms, governs the interception of conversations by means of microphones and wiretaps. The Act contains disclosure provisions, see 18 U.S.C. § 2518(8)(d). While it is true that the disclosure can, for good cause, be postponed, id., it is hard to conceive of any Court that would be willing to allow the government to eavesdrop for more than a short period of time without requiring the government to proceed with criminal charges or to discontinue the surveillance. In either event the government ultimately would be forced to disclose the surveillance.

The tendency to force the government to elect prosecution or discontinuance of the surveillance and, in either event, to disclose the surveillance, is not the only factor that leads this Court to hold that a warrant is not always required in cases involving the foreign security aspects of foreign affairs. The Court accepts as valid the government's contention that the very nature of foreign intelligence gathering does not lend itself to the present warrant requirements. Often surveillance is undertaken with no probable cause; often surveillance is undertaken with no intention of prosecuting even if strong evidence of criminal conduct is discovered. Foreign intelligence surveillance may of necessity be of considerable duration, see the related figures in Keith, note 3, 407 U.S. at 325–326 & n. 2 at 334, 92 S.Ct. 2125 (appendix to opinion of Douglas, J., concurring). The length of the surveillance, if one accepts the proposition that it may be necessary, is a circumstance which, because of the notice requirements of Rule 41 and Title III, frustrates the government's ability to obtain this information. The Court recognizes that the conduct of foreign affairs is peculiarly the province of the President, and that whoever occupies that office must have the information necessary to enable him to make decisions that vitally affect the continued security of the government. The Court also recognizes that the conduct of a foreign state can pose a threat to the government different in scope and kind from that posed by an individual or a domestic organization; also, nations have financial and technological means available to them that individuals or domestic organizations do not. It is not at all certain that a judicial officer, even an extremely well-informed one, would be in a position to evaluate the threat posed by certain actions undertaken on behalf of or in collaboration with a foreign state. The Court perceives an entirely different purpose in surveillance designed to gather foreign intelligence information from domestic surveillance. It would seem rare that the government would engage in domestic electronic surveillance without some plans to prosecute at some time. If the representations made during oral argument of this motion can be credited, it is rare that foreign intelligence surveillance is undertaken with plans to prosecute. Certainly here no such plans were present at the outset of the undertaking. Whether the intelligence loses its usefulness with the disclosure of its being obtained, or because of the traditional reluctance to reveal the extent to which security has been compromised, or whether it is for some other good reason, is not controlling. The Court is persuaded that an initial warrant requirement, at least in the circumstances of this case, would frustrate the President's ability to conduct foreign affairs in a manner that best protects the security of our government.

It is important to distinguish the frustration argument, which the Court finds persuasive, from the "necessity" argument presented during the taking of oral testimony.[4] The Court does not doubt that there are occasions when the President finds it necessary to conduct surveillance as part of his foreign affairs duties. To say, however, that because it is necessary a warrant is not required is to beg the question. Assuming, as the Court does, that it is necessary, the inquiry then shifts to the Keith analysis of whether a warrant would better protect privacy and free expression and whether

---

4. The Attorney General testified that the reason for not getting a warrant was not the notice provision of Title III, but because in his view one was not necessary in a foreign intelligence gathering operation.

imposing the warrant requirement would unduly frustrate the government's efforts to protect its security and existence.

## II.

This does not mean that the judiciary should abdicate its role as soon as the flag of foreign intelligence is raised. As noted above, the government often undertakes surveillance with no intention of prosecution; once prosecution is actively considered, however, the Court must become involved in order to determine whether the primary focus has shifted away from foreign intelligence gathering.

It is conceded that the government never obtained, nor sought to obtain, a judicial warrant for the surveillance undertaken in this case. The government urges on the Court the foreign intelligence gathering exception recognized in *United States v. Butenko, supra,* and *United States v. Brown, supra.*[5]

In *Butenko,* a case that also involved an American citizen alleged to be acting in concert with a foreign national to violate portions of the Espionage Act, the Third Circuit Court of Appeals held that, while the Fourth Amendment did apply to surveillances conducted and maintained solely for the purpose of gathering foreign intelligence information, the warrant requirement did not. 494 F.2d 605. In *Brown,* the Fifth Circuit, relying on its earlier decision in *United States v. Clay,* held that the President may constitutionally authorize warrantless wiretaps for the purpose of gathering foreign intelligence. 484 F.2d at 426. The issue before the Court in *Brown*

was not whether the conversations overheard through the exercise of this power could be admitted into evidence but whether the interception was illegal, thus necessitating their disclosure under the rule of *Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).[6]

■ The Court accepts the reasoning of *Butenko* and *Brown* and their holdings that an exception to the warrant clause is present when electronic surveillance is undertaken for the purpose of gathering foreign intelligence by the President of the United States or the Attorney General acting at the direction of the President. The Court also adopts in support of its holding the reasoning contained in the discussion of I, *supra.*[7]

This, of course, does not end the inquiry. Given that an exception for foreign intelligence gathering exists, was that exception present under the facts of this case?

*Butenko* adds the qualification *"solely"* for the purpose of gathering foreign intelligence, 494 F.2d at 605. While courts must always be on guard against government efforts to circumvent the Fourth Amendment by the use of inapplicable exceptions, it is difficult to see how a test could be formulated if the standard were that of "solely" for foreign intelligence gathering purposes. Would this require the government to be completely barred from prosecution when a genuine foreign intelligence gathering surveillance disclosed evidence of criminal activity? It seems to the Court, and there was credible evidence adduced during the hearing that would support this, that such surveillance will often turn up

---

5. The Court is cognizant of the cases of *United States v. Smith,* 321 F.Supp. 424 (C.D.Cal. 1971), and *United States v. Clay,* 430 F.2d 165 (5th Cir. 1970), *rev'd. on other grounds* 403 U.S. 698, 91 S.Ct. 2068, 29 L.Ed.2d 810 (1971), and their citation by the *Keith* Court, 407 U.S. at 322 n. 20, 92 S.Ct. 2125. The discussion in *Smith* was *dicta* while the *Clay* Court had found the conversations overheard not germane to the prosecution at issue. This is clearly not the situation in the instant case. The Court also notes that *Brown* is a later decision by the same Circuit Court that decided *Clay.*

6. Since full disclosure has been made here, this aspect of *Alderman* need not be considered. A hearing on the legality of the surveillance has been held.

7. The case of *Zweibon v. Mitchell, supra,* was cited to the Court as condemning the foreign intelligence exception. While it is possible to read the opinion that way, the plurality limited its holding to surveillance in which the subjects are neither agents nor collaborators of a foreign power. *Id.* at 651. The indictment in this case charges that the defendants are both.

evidence of criminal activity. While this Court is loathe to give the government in effect a free ride by allowing all evidence of criminal activity to be admitted once persuaded that such evidence had been obtained from a genuine foreign intelligence surveillance, it does not follow that the rejection of the "solely" test would do so. The "primary purpose" test, which in all likelihood would be applied even if nominally the test were "solely," appears to balance the interests of the government in the conduct of foreign affairs and the potential defendant. It asks "was the primary purpose of this surveillance on this day to gather foreign intelligence information?" It is with this inquiry that the Court turns to the facts of this case.

The Court has, as indicated, concluded that, at the time of its initiation, the surveillance in this case was undertaken for the primary, or even sole, purpose of foreign intelligence gathering. Deputy Secretary of State Christopher's letter to Attorney General Bell speaks of a serious compromise of the State Department's classified information. In addition, the Attorney General's testimony that he viewed his mission as the identification and prevention of the source(s) of such compromise, was convincing.

Defendants argue that the primary focus of the surveillance ceased to be the gathering of foreign intelligence early on. They point to the early involvement of Criminal Division attorneys, particularly a May 26, 1977 Memorandum from Clarence Kelly, FBI Director, to Attorney General Bell, requesting authorization for installation of a microphone at the residence of defendant Hung. Defendant's Ex. 1. On page 2 of that memorandum is the following paragraph:

On May 25, 1977, John L. Martin, Deputy Chief, Internal Security Section, Criminal Division, U.S. Department of Justice, advised that, if prosecution is undertaken against Hung, Humphrey or others for violating the Espionage Act and related statutes, he would recommend that action described above taken by the Attorney General be defended in court using the same legal justification currently used in national security and electronic surveillance motions.

The Court is not persuaded that this paragraph establishes the shift in primary focus away from foreign intelligence gathering. The paragraph immediately preceding the quoted one states, in part, that ". . . this [microphone] coverage could afford the possibility of ascertaining the identities of other individuals who may be furnishing sensitive U.S. Government information to Hung." The Court also notes that the Memorandum is tentative in tone; the reference therein to prosecution is conjectural, offering a justification *if* prosecution is undertaken. The Court cannot say that this indicates a shift in primary focus away from foreign intelligence gathering. In order to do so it would require a holding that whenever any evidence is adduced indicating that the government ever *considered* prosecution, the primary focus, by definition, had shifted away from foreign intelligence gathering. It is unrealistic to expect, in a case like this one, that the option of prosecution is never considered. The relevant inquiry remains however: when, if at all, did the primary focus of the surveillance shift away from foreign intelligence gathering?

The Court reaches the same conclusions about the setting up of a criminal file during this same period of time. No one disputes that the electronic surveillance uncovered evidence of criminal activity almost immediately; it is logical that whatever file was opened in the Department of Justice would have a criminal number. That such a file was opened, and that it bore the designation SRV/Esp (Socialist Republic of Vietnam/Espionage) and SRV–RA (Socialist Republic of Vietnam—Registration Act), is a factor to be considered, but it is not dispositive. The Court has considered these facts but it is not persuaded that the focus had shifted by late May.

The Court, however, is not convinced that the primary purpose of the surveillance remained foreign intelligence gathering

throughout the life of the surveillance. While no one event, act, or conversation in itself pinpoints an exact date, the following chronology of events shows not just an increasing awareness of criminal prosecution but an approach to a commitment to prosecution. Attorney General Bell's affidavit shows that little, if anything, in the way of new foreign intelligence came to light after June. Evidence adduced at the hearing indicated a growing involvement of the Criminal Division of the Justice Department, beyond the opening of a criminal file and the initial prosecutive evaluation referred to above. The testimony of John Martin, Deputy Chief, Internal Security Section, Criminal Division, indicated that in June the discussion of possible prosecution inside the Justice Department was coincidental to the foreign intelligence investigation. The impression created of the early meetings was that Martin was simply being briefed by the FBI on the status of one foreign intelligence investigation. The Court also notes that during his early involvement in the case Martin offered no advice as to how the tap should be conducted or as to the focus of the investigation. Tr. 24–25. The documents submitted to the Court *in camera* (March 20, 1978 submission) support this testimony. Those same documents, however, also support the conclusion that by midsummer the primary focus of the investigation had shifted away from foreign intelligence gathering. A July 19 Status Memorandum, Exhibit D *in camera*, states for the first time that probable cause existed to charge both defendants. That Memorandum is clearly a prosecution-oriented document, focusing on the availability of witnesses and documents. A July 20 letter from the Attorney General to the Director of Central Intelligence, Exhibit E *in camera*, encloses a copy of the July 19 Memorandum and a fair characterization of the cover letter would be that it shows the Justice Department trying to put together a criminal case. A similar letter to Zbigniew Brzezinski, Assistant to the President for National Security Affairs, Exhibit G *in camera*, contains this sentence: "The State Department and the CIA have been requested to make the necessary documents and witnesses available for use at trial." The Court cannot conclude that at that point the primary focus of the investigation remained foreign intelligence gathering; on the contrary, the documents indicate that the primary focus had shifted away from such gathering. While it is true that the testimony and exhibits (including those submitted *in camera*) show that the Justice Department may not have had a "winnable" case until much later, this is not the test. The test is: what is the primary focus of the investigation? The Court concludes that by July 20, 1977, the primary focus of the investigation was no longer foreign intelligence gathering, and therefore all evidence obtained from the telephone and microphone surveillance after July 20, 1977, as well as the fruits thereof, must be suppressed.

### III.

The final question to be addressed is, regardless of whether the surveillance can be justified, was it reasonable? Two issues are raised: the duration of the surveillance and the minimization of the intrusion.

The intrusion in this case was massive. The interception on Hung's apartment began on May 11, 1977, and ran continuously for two hundred and sixty-eight (268) days. There is a representation in Humphrey's Motion to Suppress at p. 6, that the government estimates the number of calls involving Humphrey intercepted as approximately twenty (20) and the total number of calls intercepted as in excess of 500. The microphone in Hung's apartment was installed May 27, 1977; it too ran continuously and for a period of two hundred and fifty-five (255) days. It is uncertain how many conversations of defendant Humphrey were monitored. Finally on or about June 20, 1977, pursuant to an authorization of the President of the United States, a videotape camera was installed in defendant Humphrey's office in the United States Information Agency (USIA). That surveillance ran for eighty-five (85) days, terminating on September 15, 1977.

In view of the previous holding, based upon a shift in the primary focus of the investigation away from foreign intelligence gathering, that all such evidence obtained after July 20, 1977, should be suppressed, the Court need only consider whether the surveillance was reasonable up to that date. The Court concludes that it was reasonable. An investigation such as this one may take a considerable amount of time. Code names may be utilized, and apparently innocuous conversations may, upon expert examination, reveal a more sinister context. It is difficult to see how, absent a blanket interception for a reasonable period of time, the government could assure itself that all the actors in an espionage ring had been identified.

■ Were the Court to consider whether beyond July 20, 1977, the interception continued to be reasonable, a separate treatment of the videotape interception would be necessary. *See* the discussion *infra*. Regarding the telephone and microphone surveillance, there was no evidence proffered by the government (on whom the burden rested) as to what period of time would be reasonable. However, it is hard for the Court to conceive that by July 20, 1977, after a blanket interception of over eighty days, the participants could not have been identified, and at least some greater selectivity exercised, even if necessity for the surveillance continued.[8] Therefore, the Court finds that the warrantless tap and bug became unreasonable after July 20, 1977.

A separate discussion of the videotape intrusion is required. Humphrey has standing to object to that intrusion. *Mancusi v. DeForte*, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968). While the defendant does not discuss this intrusion at great length, and while the government, asserting that the tapes are illegible and will not be used in its case, does not discuss the issue at all in its brief, certain observations are relevant in the event that the progress of the case causes a change in the government's position.

First, while the Court assumes that there exists some expectation of privacy in an office, that expectation is a lesser one than that of a home. One assumes that in an office conversations may be overheard and actions observed. At the minimum it would appear that one's employer would have a right to see that the employee was performing as expected.

Second, the Court notes that the videotape intrusion, unlike the telephone and microphone intrusion, was minimized in the material acquired. There was no voice interception, only Humphrey's physical movements around the office were monitored. Even more important is the fact that the intrusion was expressly designed to observe the conduct most relevant to the government investigation: was Humphrey copying or stealing classified government documents from his employer?

■ Thus, while the Court finds the Fourth Amendment applicable to this surveillance, it also finds it justified by the same rationale as the telephone and microphone surveillance, and it finds the intrusion reasonable, at least until July 20, when as found above, the primary focus of the investigation shifted away from foreign intelligence gathering. Continued video surveillance after that date, however, was reasonable because of the office setting and the limited scope of the intrusion. Nevertheless, for the other reasons previously set forth, the warrantless surveillance on and after July 20 is improper. Defendant's Motion to Suppress the Video Surveillance prior to July 20, 1977, is accordingly denied.

*Defendant Hung's Motion to Suppress No. 3 (Physical Seizures)*

On April 22, 1977, FBI Special Agent William Fleshman, Jr., received a flight bag from Ms. Hung Krall ("the Asset"). The Asset testified that she had received the

8. Social contacts were eliminated from microphone surveillance as was one attorney-client telephone conversation.

assorted contents of the bag from defendant Hung on April 19 and 21 with instructions to handcarry them to designated individuals in Paris, France. The flight bag, which belonged to the Asset and into which she had placed the items, contained a number of books, some sealed envelopes and a large unsealed manila envelope. Inside that unsealed envelope was a George Washington University bookstore bag approximately 8½″ × 11″ tied with twine. The bookstore bag [9] was made of a thin plastic and was doubled over at the top. The plastic was sufficiently thin that, through it, lettering could be read on the top sheet of the bundle of papers that was contained within. The documents were further secured inside the bookbag by strips of heavy opaque paper which covered approximately 75% of the surface of the papers. This bundle is the basis of defendant's first Motion to Suppress No. 3 (Physical Evidence).

On April 22, 1977, a representative of the FBI Office of Legal Counsel met with Acting Assistant Attorney General John M. Harmon, head of the Office of Legal Counsel, Department of Justice. At this meeting, Harmon was informed that the FBI had intercepted a package and wished to open it to inspect its contents. The package was not presented to Harmon at this meeting, nor was any photograph or facsimile. The FBI official described the seized package and the facts surrounding the seizure. Based upon those representations, Harmon concluded that since it was "unsealed" there was no reasonable expectation of privacy in that package and that no warrant or authorization from the President was necessary to legally open the package.

Defendant attacks the warrantless opening of this package and urges that its con-

tents as well as the fruits thereof be suppressed. The government first contends that the evidence is not suppressible based on a theory of consent. Second, the government argues that Hung had no reasonable expectation of privacy in that package and thus Fourth Amendment protections do not attach. The Court agrees with this second argument and turns to it first.[10]

The government contends that the flimsy nature of the wrapping and the fact that the package was given over to another person (albeit a government agent, *see, infra*) for delivery across international borders vitiated the reasonable expectation of privacy that traditionally attaches to wrapped packages. The government further points out that Hung never gave his courier specific instructions concerning the jumble of materials turned over and that if all went as Hung planned he was never again going to see or possess that package.

The appropriate standard of review for the Court is whether the expectation of privacy is reasonable given the totality of the circumstances. *United States v. Rabinowitz*, 339 U.S. 56, 66, 70 S.Ct. 430, 94 L.Ed. 653 (1950). The facts of this case indicate that such an expectation of privacy was unreasonable as to the April 22 package. Various factors enter into this consideration.

Defendant Hung's expectation of privacy was to some extent undercut by the fact that these materials were being sent across international borders. Defendant is presumed to know of the risk of inspection by government officials when ingress or egress from our borders is involved. *United States v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977); *Almeida-San-*

---

**9.** The Court has not inspected the original package, and presumably it is no longer available. The FBI opened the package, photographed its contents and repackaged it before returning it to the Asset for its eventual delivery to the Paris recipients. The Court bases its description of the package on the testimony adduced at suppression hearings on March 17 and 20, 1978, a facsimile introduced by the government (without objection from the defendant as to the accuracy of reproduction) and

a photograph taken prior to the April, 1977, opening submitted by the United States at the request of the Court while these motions were under advisement.

**10.** The government concedes that the foreign intelligence gathering exception discussed earlier in this opinion does not cover the April seizure because no Presidential authority was sought or obtained prior to opening this package.

*chez v. United States,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973). However, this consideration of itself does not eliminate a reasonable expectation of privacy. In the Court's view the pivotal factor in the analysis of this seizure is the wrapping of the package itself.

In order for an individual to have a reasonable expectation of privacy, common sense demands that certain steps be taken in certain circumstances. For example, papers left on one's desk in one's home may be assumed to be immune from the suspicious gaze of government agents acting without a warrant. On the other hand, if those same papers are left on a table at a public library some additional affirmative action may be required on the part of the owner to make his expectation of privacy reasonable. In short, it is fair to expect greater efforts to insure privacy as the degree of "publicness" surrounding the papers increases. Although no one hard and fast rule could possibly cover all situations, the Court views steps such as covering the papers with a binder or more likely, sealing or affixing a seal as the sort of behavior consistent with a concern for the privacy of the papers contained within.

■ In the case at bar, the Court notes that, although tied with twine and covered with a flimsy bookbag, the contents were neither totally hidden from view nor inaccessible by virtue of the gum seal of an envelope or some more elaborate wax seal. The Court finds that this apparent lack of concern for the secrecy of the contents of the package fatally undercuts defendant's expectation of privacy, such that the protections of the Fourth Amendment do not attach. Defendant's Motion to Suppress

the contents of the April 22 search is therefore denied.

■ On May 12, 1977, the Attorney General sought and received from the President authorization for physical searches of sealed packages and envelopes delivered to the FBI by the Asset, where such packages or envelopes were sent from or to be delivered to identified intelligence personnel of a foreign country.[11] That same day the Asset delivered to Special Agent Fleshman a letter to defendant Hung from Phan Thanh Nam, an SRV official in Paris. The letter was sealed in an envelope.[12] The May 12 delivery is thus distinguishable from the events of April 22 for that critical reason. By the simple act of sealing an envelope the owner is in effect saying to the world "the contents of this envelope are not intended for your eyes." Hence, the Fourth Amendment attaches because the defendant Hung had a reasonable expectation of the privacy of that communication and the government's warrantless search must be justified by reliance on one of the "jealously and carefully drawn" exceptions to the warrant requirement. *Coolidge v. New Hampshire,* 403 U.S. 443, 454, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

■ Prior to this search the FBI obtained authorization from the President to open the envelope without a warrant. This brings into play the foreign intelligence gathering exception to the warrant requirement discussed earlier in this Opinion. Since this search occurred prior to July 20 (the point at which the Court has found that the focus of the investigation shifted away from intelligence gathering) the warrant exception applies, and the evidence will not be suppressed unless the govern-

11. (Documents 78–25–10 and 78–25–11). Authorization for seizures under similar conditions was sought and obtained on September 8, 1977 (Documents 78–25–23 and 78–25–24) and on September 21, 1977 (Documents 78–25–25 and 78–25–26).

12. As was the case with the April 22 package, the Court has not inspected the May 12 original; it was delivered to Hung after opening, photographing and repackaging by the FBI.

The same is true of the various packages and envelopes that are the focus of the remainder of Motion to Suppress No. 3 (Physical Seizures). The Court's descriptions of these materials are once again based upon testimony at the suppression hearings and photographs supplied by the FBI at the Court's request. No facsimiles were submitted. Defendant has not objected to the government's descriptions of the seized packages and envelopes.

ment's behavior was unreasonable.[13] The Court finds that the FBI's opening, photographing and repackaging was reasonable, and the defendant's Motion to Suppress No. 3 as to the May 12 search must be denied.

On June 23, 1977, the Asset again met with defendant Hung and this time the defendant furnished the Asset with a large grocery bag. Inside this bag was a large manila envelope which contained assorted materials, including one sealed envelope, one envelope secured by a metal clasp and one unsealed envelope. Following the analysis applied to the earlier deliveries, a reasonable expectation of privacy attached to the sealed and to the clasped envelope. Once again, however, the search occurred pursuant to the President's foreign intelligence gathering power and prior to the July 20 shift of focus. Therefore, the Motion to Suppress No. 3 as to the June 23 package is denied. The same result applies to what appears to be another sealed envelope given to the Asset for delivery from Hung to SRV intelligence personnel in Paris that same day.

On September 13, 1977, the Asset delivered to Special Agent Fleshman a letter for Hung from Phan Thanh Nam in Paris. This was once again a sealed envelope, so that Fourth Amendment protections attach. This search occurred two months after the date the Court has found that the investigation altered its focus, and hence, the evidence is not admissible in the government's case on the basis of the foreign intelligence gathering exception.

The government offers as an alternative a theory of consent that would, if accepted by the Court, bring in evidence that was the result of searches that occurred after the shift of focus. Briefly summarized, the government's argument goes as follows: Hung gave his implied consent to the Asset to open the package by virtue of his instructions to deliver the packages over international boundaries and the fact that the

Asset had what the government terms "undisputed authority and control over the packages." In other words, the government argues that Hung assumed the risk that the courier would not be trustworthy and must suffer the consequences.

The government's theory fails for several reasons. First, the contention that the Asset was given "undisputed control" over the contents of the packages and sealed envelopes is essentially unsupported in the record and is undercut by the very sealing of the envelopes. The status of "bailee" (*see* Government's Opposition, p. 63) does not carry with it the implication that the tender is without limitation. The record is barren of any indication that the Asset shared with Hung any "joint" possession or other relationship with the documents whatsoever. She was, as far as Hung was concerned, the personal equivalent of United Parcel Service; that is, a non-government courier.

By the same token, whatever "consent" was given here was clearly violated by the scope of the intrusion, certainly as to those seizures which occurred after the April seizure. The case of *United States v. Glassel,* 488 F.2d 143 (9th Cir. 1973), is instructive here. In that case an informant and a police officer (misrepresenting his identity) obtained an invitation into defendant's house. The court there ruled that the two could properly gain the consent to enter by false pretenses, but that once inside, their search had to be limited to the scope of the consent; hence, seizures of contraband in plain view were admissible but evidence gained from a full-scale search was not. *Id.* at 145.

In the case at bar, the Asset gained the "consent" to deliver the materials and perhaps the right to inspect what was in plain view (i. e., not in a sealed or otherwise secured status), but cannot fairly be said to have been given consent to take that key

---

**13.** The Court is unpersuaded that there is any constitutional significance to the fact that this was a physical seizure and search and not an electronic seizure. It would be incongruous indeed were a court to find the opening of an envelope more intrusive than a wiretap or bug that runs for weeks at a time.

extra step the opening of a sealed communication. As in *Glassel, supra,* that extra step—was beyond the scope of the consent that was given or that can fairly be implied from all the circumstances.

The government's position is additionally troubling to the extent that it assumes that the Asset can give the broad-gauged consent asserted herein. The government cites cases involving landlords giving consent for tenants, one roommate for another, a messenger for his employer. Perhaps the heaviest reliance is placed on the recent Fourth Circuit decision in *United States v. Carter,* 569 F.2d 801 (1977). In that case the owner of a truck allowed the FBI to search the truck regularly assigned to his employee Carter. The search led to a pistol. The Court of Appeals rejected the defendant's argument that the evidence should be suppressed because the gun was found wrapped inside a coat inside the truck. The consent was given broad construction because the consenting party had "dominion over the property." At 803.

■ What the government fails to point out in this case is that besides the fact that this consenting party (the Asset) had no colorable claim to the contents of sealed envelopes given her for transmission purposes, the broad scope of consent they urge here necessarily comes from the government *itself.* The Asset is clearly an "agent" of the government under the facts of this case. The testimony shows that she has been working closely with (first) the CIA and (later) the FBI for well over a year prior to the searches and seizures in question. She had been party to sensitive discussions both here and abroad with agents and officials of both agencies. Her cooperation was considered vital and was a topic of extensive discussions at the very highest levels of our government. Finally, *in camera* documents indicate that "remuneration" for her efforts involved promises of assistance quite different than those commonly given government informants. In short, she was clearly an operative of the government acting under their direction and control, far more important and deeply involved in this sensitive investigation than the garden-variety informant. To accept her consent as binding on the defendant and to construe it broadly is paramount to allowing the government to itself consent to searches on behalf of a defendant, clearly an unacceptable result.

The government cites two cases for the proposition that it is irrelevant that the consent was given by an informant. Both of these cases, *United States v. Tussell,* 441 F.2d 1092 (M.D.Pa.1977), and *United States v. Kurck,* 552 F.2d 1320 (8th Cir. 1977), are inapposite, as the informants there did not have the unique agency relationship with the United States that characterizes this case.[14] *Cf. Burdeau v. McDowell,* 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921).

Therefore, the Court grants defendant's Motion to Suppress as to the September 13 letter.

■ On September 19, 1977 Hung furnished the Asset with several items to be delivered to SRV intelligence personnel in Paris. One of these items was a sealed manila envelope, and again the Asset gave the envelope to the FBI for opening. Consistent with the above analysis, there was a reasonable expectation of privacy in the sealed envelope; the search, occurring after the July 20 shift of focus, is not covered by the foreign intelligence gathering exception to the warrant requirement. Finally, the Court, for the same reasons, rejects the government's consent theory. The September 19 evidence must therefore be suppressed.

On September 20, 1977, Hung gave the Asset a final letter for delivery to SRV officials in Paris. Applying the identical analysis, this evidence must be suppressed as well.

---

**14.** The agent/informant distinction was, in fact alluded to in one of the cases cited by the government. In *Tussell* the Court noted "There was no evidence that Mettrick was acting as an agent of, as opposed to an informer for, the Customs Service." 441 F.Supp. 1104, n. 24.

The Court notes that only defendant Hung filed the Motion to Suppress No. 3 (Physical Evidence) discussed in this portion of the Opinion.[15] Therefore, the physical evidence is suppressed only as to defendant Hung, the victim of the enumerated illegal searches. However, the Court is cognizant of the severely prejudicial impact the admission of this evidence against the co-defendant would have on Hung at the eventual joint trial on the merits, prejudice that could impermissibly taint the fundamental fairness of the proceeding.

15. The Court doubts whether Humphrey in any event has standing to challenge the searches, as none of the evidence was in Humphrey's possession at the time of the search nor is possession by Humphrey an essential element of the offense charged. *See, Brown v. United States,* 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); *United States v. Lang,* 527 F.2d 1264 (4th Cir. 1975).