February 2, 1979

## 79-10   MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

### Constitutional Law—Fourth Amendment— Interception of Oral Communications—Legality of Television Surveillance in Government Offices

This responds to your request for our opinion concerning the legality of using concealed television cameras for surveillance in buildings owned by or leased to the Government, where the Government officer occupying the particular space has consented to the surveillance.

While existing statutes govern certain aspects of television surveillance, no statute specifically regulates the surveillance for law enforcement purposes. The requirements of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.*, would apply if a television device intercepts an oral communication "uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation." 18 U.S.C. § 2510(2). In the area of foreign intelligence and foreign counterintelligence, the recently enacted Foreign Intelligence Surveillance Act of 1978 specifically encompasses television surveillance "under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes." 50 U.S.C. § 1801(b)(4). That Act generally requires that any such surveillance undertaken for foreign intelligence purposes be authorized by judicial order.

Since the existing statutes do not cover much of this area,[1] the Fourth Amendment is the only existing check on governmental action in similar situations. The relevant statutes are themselves predicated on the Fourth Amendment, and are framed in terms of that Amendment's test of "reasonable expectation of privacy." Our discussion will focus on the requirements of the Fourth Amendment.

---

[1] For example, Title III does not apply to surveillance that does not intercept communications, and the Foreign Intelligence Surveillance Act of 1978 would not apply to surveillance conducted outside the United States.

We have identified only a few cases dealing with the Fourth Amendment aspects of surreptitious television surveillance.[2] While these cases apply generally to surveillance conducted in Government buildings, we do not believe that the case law in this area has been developed sufficiently to provide authoritative guidance. The following discussion will therefore be drawn from the general principles of Fourth Amendment law and its application in analogous contexts.

The starting point in our analysis is the Supreme Court's decision in *Katz* v. *United States*, 389 U.S. 347 (1967), holding that the Government may not, without warrant or in the absence of exigent circumstances, violate "the privacy upon which [an individual] justifiably relied." *Id.* at 353. In delineating the circumstances in which one may have a justifiable expectation of privacy, the Court stated:

> What a person knowingly exposes to the public even in his own home or office, is not a subject of Fourth Amendment protection * * *. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected. [389 U.S. at 351–52.]

Justice Harlan, in elaborating on this concept, stated that whether what one seeks to preserve as private will, in fact, be constitutionally protected depends on whether that expectation of privacy is "one that society is prepared to recognize as 'reasonable.' " *Id.* at 361. *See also, United States* v. *White*, 401 U.S. 745, 752 (1971).

Under these principles, the installation and maintenance of video surveillance in a private office would constitute, in our opinion, an invasion of one's reasonable expectation of privacy and would thus be a search and seizure within the Fourth Amendment. *See, United States* v. *Humphrey, supra,* 451 F. Supp. at 60; *People* v. *Teicher, supra* at 590. The next

---

[2] The most recent, *United States* v. *Humphrey*, 456 F. Supp. 51 (E.D. Va. 1978), will be more fully discussed below. *United States* v. *McMillon*, 350 Supp. 593 (D.D.C. 1972) upheld police visual observations and videotapes of an individual's yard; the court reasoned that, since the officers had authority to be on an adjacent piece of property, the observations were within the plain view doctrine and that the police actions were reasonable under the circumstances. *Poore* v. *State of Ohio*, 243 F. Supp. 777 (N.D. Ohio 1965), *aff'd,* 366 F. (2d) 33 (6th Cir. 1966), was a pre-*Katz* decision concluding that police observations and movies made from behind a "two-way" glass in a men's washroom were not a search, for the reason that any member of the public might have walked into the washroom and made the same observations.

The State courts have also dealt on occasion with this issue. *People* v. *Teicher*, 395 N.Y.S. 2d 587 (N.Y.S.C. 1977), upheld a visual surveillance conducted pursuant to court order against contentions that the court had no statutory authority to issue the order and that it did not conform to the Fourth Amendment's requirements as to probable cause, particularly, minimization, and use of electronic surveillance where other investigative tools were available. Another decision, *Avery* v. *State*, 292 A.2d 728 (Md. Ct. of Special Appeals 1972), *appeal dismissed*, 410 U.S. 977 (1973), upheld the warrantless use of a television camera primarily on the ground that the surveillance was conducted with the full cooperation and consent of the victim. *Sponick* v. *City of Detroit Police Department*, 211 N.W. 2d 674, 690 (Mich. Ct. App. 1973), upheld television surveillance of a bar on the ground that the surveillance only made "a permanent record of what any member of the general public would see if he entered the tavern as a patron."

question is whether the situation differs when the surveillance is conducted in Government buildings or offices. For the following reasons we believe that the situation is not any different in Government offices and that persons within Government offices also have a reasonable expectation of privacy.

## A.

Surveillance in a Government office still constitutes a search within the Fourth Amendment. In *United States* v. *Hagarty*, 388 F. (2d) 713 (7th Cir. 1968), the only Court of Appeals decision to date applying *Katz* analysis to the question of a warrantless continuous electronic surveillance in a Government office, the court held that evidence obtained by such a surveillance violated the Fourth Amendment. The court stated that the key question under *Katz* was whether the defendant sought to exclude "the uninvited ear" and that, under this standard, it was "immaterial that the overheard conversation took place in an IRS office." *Id.* at 716. The same rationale would apply to a visual surveillance by electronic means.

In *United States* v. *Humphrey, supra,* the court indicated that while one's reasonable expectation of privacy is less in an office than at home, the television surveillance of the Government office involved was subject to the Fourth Amendment. 451 F. Supp. at 60.[3]

Several arguments, predicated on the Government's authority over its buildings, may be advanced contrary to this result. First, it is a familiar canon that one with joint access or control over property may permit it to be searched, *United States* v. *Matlock,* 415 U.S. 164, 171 note 7 (1974), and the Government's control over its buildings may be a basis for allowing the appropriate officials to "consent" to the search. However, the courts have not taken such a broad view of the Government's authority. The cases generally utilize the traditional test whether the property has in a practical sense been devoted to the exclusive use of the employee. *See, United States* v. *Blok*, 188 F. (2d) 1019 (D.C. Cir. 1951) (search of employee's desk); *United States* v. *Kahan*, 350 F. Supp. 784 (S.D.N.Y. 1972), *aff'd on other issues,* 415 U.S. 239 (1974) (search of employee's wastebasket). *Cf., United States* v. *Millen*, 338 F. Supp. 747, 753 (E.D. Wis. 1972). Under this test, if the property has been devoted to the exclusive use of a person, he has a justifiable expectation of privacy in it sufficient to insulate the property from search even though the search is

---

[3] The court found, first, that the television surveillance was justified by the same exception for audio surveillance, and that the intrusion was reasonable, at least until the date that the primary focus shifted from foreign intelligence. The court then found, however, that television surveillance after that date was reasonable due to the office setting and the limited scope of the intrusion. It is unclear whether this latter finding was meant to suggest that television surveillance might be conducted without a warrant even in a law enforcement context so long as it is conducted reasonably, or whether it was only addressing the issue of reasonableness apart from the warrant question.

consented to by the owner of the property (or his agent) who for certain purposes at least has authorized access to the property. *See, Stoner* v. *California,* 376 U.S. 483 (1964); *Chapman* v. *United States,* 365 U.S. 610 (1961).

More importantly, it is doubtful whether the Government's "consent" has any validity with respect to surveillance of an individual, as opposed to discrete physical searches. Under Title III of the Omnibus Crime Control Act electronic monitoring of telephonic and oral communications requires a warrant even though the owner of the property or the subscriber to the telephone has consented; only the consent of a party to a communication suffices to dispense with the warrant requirement. *See* 18 U.S.C. § 2511 (2)(c). The same was true prior to Title III under § 605 of the Communications Act of 1934, 47 U.S.C. § 605, with respect to telephone communications. *See, Rathbun* v. *United States,* 355 U.S. 107 (1957).

These statutory restrictions have a constitutional foundation. The cases upholding the doctrine of consent to surveillance under the Fourth Amendment are not predicated on the consent of the owner of the pertinent property, but rather on the consent of the person to whom the targeted individual reveals his communications or activities. *United States* v. *White, supra.* The underlying rationale seems to require that the doctrine be kept within these limits. The courts reason that there can be no justifiable expectation of privacy regarding information voluntarily revealed to another; one's confidant may later reveal the disclosures to the Government. *Hoffa* v. *United States,* 385 U.S. 293 (1966). The use of electronic equipment, with the confidant's consent, to record these disclosures simultaneously is then regarded as much the same as a subsequent disclosure to the Government. *Lopez* v. *United States,* 373 U.S. 427 (1963). The "consent" necessary for the surveillance is thus that of the confidant, whose ability to report to the police is equated with the electronic surveillance—*i.e.,* the one to whom the disclosures are made.

The Government's authority over its buildings may raise another question. It is a generally accepted principle of Fourth Amendment law that no "search" occurs when an officer observes objects or activities from a location where he has a right to be. *Harris* v. *United States,* 390 U.S. 234, 236 (1968). *See also, McDonald* v. *United States,* 335 U.S. 451, 458 (1948) (Jackson, J., concurring). Under this rationale, courts have upheld searches of areas that are usually deemed quite private—*e.g.,* looking into bedrooms, *United States* v. *Johnson,* 561 F. (2d) 832 (D.C. Cir. 1977) *(en banc)*; *Nordskog* v. *Wainwright,* 546 F. (2d) 69 (5th Cir. 1977); or bathrooms, *Ponce* v. *Craven,* 409 F. (2d) 621 (9th Cir. 1969), *cf. Smayda* v. *United States,* 352 F. (2d) 251 (9th Cir. 1965).

Even searches when the police went to great lengths to secure a view from a position where they were authorized to be were upheld by the courts: for example, searches through only a narrow opening, *see, United States* v. *Wright,* 449 F. (2d) 1355 (D.C. Cir. 1971) (peeping through an 8-to-9-inch crack in garage); *United States* v. *Vilhotti,* 323 F. Supp. 425,

431-32 (S.D.N.Y. 1971) (gaps between boards covering window),[4] or where the officers had to go through various machinations to conduct their "search," *see, e.g., James* v. *United States,* 418 F. (2d) 1150, 1151 note 1 (D.C. Cir. 1969) (squatting to see under garage door), *United States* v. *Fisch,* 474 F. (2d) 1071 (9th Cir. 1973) (listening at crack below door between motel rooms),[5] or even where Government agents have resorted to artificial means to conduct their surveillance. *See, United States* v. *Solis,* 536 F. (2d) 880 (9th Cir. 1976) (use of dogs to smell drugs); *Fullbright* v. *United States,* 392 F. (2d) 432 (10th Cir. 1968) (use of binoculars to see through shed door). *Cf., United States* v. *Lee,* 274 U.S. 559, 563 (1927).[6] These cases could arguably allow the surveillance here, since the Government's authority over its premises could certainly confer on an officer the right to be in the location from which he could conduct the surreptitious monitoring. In fact, one decision upholding the use of video equipment relied in part on this rationale. *See, United States* v. *McMillon, supra.*

We think, however, that this is not a controlling principle here. In the cited cases the Government agent's "search" was usually limited in time; the outcome of the case may have been different were the investigation an ongoing one. *Cf., Texas* v. *Gonzales,* 388 F. (2d) 145 (5th Cir. 1968) (involving repeated police peeps through window). Moreover, the targeted individual himself left his affairs open to public view in these cases. *See, e.g., United States* v. *Coplen,* 541 F. (2d) 211, 215 (9th Cir. 1976); *Ponce* v. *Craven, supra* (both suggesting that if an individual wanted privacy, he should have closed the window to public view). This rationale has little applicability in a Government office where an individual cannot bar entry to a Government agent. *Cf., United States* v. *Holmes,* 521 F. (2d) 859, 865 (5th Cir. 1975), *aff'd by an equally divided court,* 537 F. (2d) 227 (5th Cir. 1976) (*en banc*).

More importantly, however, adherence to this "plain view" rationale in all circumstances would disregard the fundamental teaching of *Katz.* The Court there decided that individuals might retain under the Fourth Amendment a justifiable expectation of privacy despite the existence of sophisticated techniques that could intrude on that privacy. Just as this precept holds true in the area of oral communications, it would appear to be equally applicable with respect to an individual's activities. Of course, the fact that these activities are visible by officers in a position where they are authorized to be will bear heavily on the issue whether a person's expectations of privacy are reasonable. But this fact cannot be determinative without ignoring the essential inquiry mandated by *Katz.*

The courts appear to share this view of Katz. In response to intrusive

---

[4] *See also, People* v. *Berutko,* 453 P. 2d 721 (S.C. Cal. 1969) (opening in drape).

[5] *See also, State* v. *Day,* 362 N.E. 2d 1253 (Ohio Ct. of App. 1976). *But see, State* v. *Kaaheena,* 575 P. (2d) 462 (S.C. Haw. 1978).

[6] *See also, Commonwealth* v. *Hernley,* 263 A. 2d 904 (Pa. Super. Ct. 1970) (use of ladder and binoculars); *People* v. *Ferguson,* 365 N.E. 2d 77 (Ill. App. 1977) (use of binoculars).

investigative methods, the courts have gone beyond the test of whether the officer was where he was authorized to be and focused instead on whether his observations intruded on a reasonable expectation of privacy. In *United States* v. *Kim*, 415 F. Supp. 1252, 1254 (D. Haw. 1976), the court explicitly stated that *Katz* protected individuals against "unreasonable visual intrusions," even from viewpoints where the police had a right to be, and held that the Government's use of a powerful telescope to observe activities in the defendant's apartment constituted a search.[7] The courts have also held invalid those police searches which, although not dependent on sophisticated equipment, depended on particularly intrusive methods of search to view areas usually considered private. *See, e.g., Kroehler* v. *Scott,* 391 F. Supp. 1114 (E.D. Pa. 1975) (peephole use to view public toilet stall).[8]

This approach is also reflected in the cases upholding police investigative activities. It is implicit in the decisions upholding police observations into windows on the ground that, because the area was open to public view, no reasonable expectation of privacy existed. More recent decisions make this trend more explicit by going beyond the "plain view" concept and inquiring whether the investigation intruded into the subject's privacy or constituted reasonable police conduct. *See, e.g., United States* v. *Solis, supra* (use of dogs to smell drugs in trailer home); *United States* v. *McMillon, supra. See also, United States* v. *Bronstein,* 521 F. (2d) 459, 464 (2nd Cir. 1965) (Mansfield, J., concurring); Comment, Shiner, *Police Helicopter Surveillance,* 15 Ariz. L. Rev. 145, 162–67 (1973).

We believe that this approach would, at the least, preclude a mechanistic resort to warrantless television surveillance in Government buildings, although the Government may otherwise have full authority to implement the monitoring. While Government employees may not reasonably expect that their activities will remain wholly private, the *Hagarty* and *Humphrey* decisions demonstrate that at least some employees may retain justifiable expectations of privacy at work.

A reasonable expectation of privacy is a factual matter and there may be circumstances when no such expectation exists. For example, where (1) the search is directly related to safeguarding the integrity of the work being performed by the employee, (2) the employee has effective notice that such a search might be made, and (3) there is an especially important public need concerning the integrity of the work being performed by the employee, the employee probably has no justifiable expectation of privacy.

---

[7] *See also, People* v. *Fly,* 34 Cal. App. 3d 665 (1973) (use of telescope); *People* v. *Sneed,* 32 Cal. App. 3d 535 (1973) (use of helicopter); *but see, State of Hawaii* v. *Stachler,* 570 P. 2d 1323 (Haw. 1977) (use of helicopter); *People* v. *Superior Court,* 37 Cal. App. 3d 836 (1974) (air patrol); *Dean* v. *Superior Court,* 35 Cal. App. 3d 112 (1973) (use of helicopter).

[8] *See also, People* v. *Triggs,* 506 P. 2d 232 (Cal. 1973) (observation of a toilet stall) and cases cited therein; *State* v. *Bryant,* 177 N.W. 2d 800 (Minn. 1970) (same); *State* v. *Kent,* 432 P. 2d 64 (Utah 1967) (observation from motel attic through ventilator to bathroom and part of bedroom).

*See, United States* v. *Bunkers,* 521 F. (2d) 1217 (9th Cir. 1975); *United States* v. *Collins,* 349 F. (2d) 863 (2nd Cir. 1965) cert. denied, 383 U.S. 960 (1966); *Shaffer* v. *Field,* 339 F. Supp. 997 (C.D. Cal. 1972), *aff'd,* 484 F. (2d) 1196 (9th Cir. 1973); *United States* v. *Donato,* 269 F. Supp. 921 (E.D. Pa. 1967), *aff'd,* 379 F. (2d) 288 (3d Cir. 1967).

In most cases where the television surveillance is related to the safe-guarding of the integrity of the employee's work, the surveillance could also be characterized as a search for evidence of crime; some courts have taken a dim view of warrantless searches conducted on Government premises for this purpose. *See, United States* v. *Hagarty, supra,* at 718; *United States* v. *Blok, supra,* at 1201. *Cf., McMorris* v. *Alioto,* 567 F. (2d) 897, 900 (9th Cir. 1978). Second, it is not entirely clear whether in most cases the employees receive effective notice, or even any inkling, that they may be subjected to surreptitious electronic surveillance; the absence of such notice may preclude such surveillance. *See, United States* v. *Speights,* 557 F. (2d) 362 (3rd Cir. 1977) (relying heavily on absence of notice to overturn search of employee's locker). Finally, even if the Government does give warning of surreptitious television monitoring, it is questionable whether the courts would uphold searches based upon such notice in all circumstances. The courts have, in other contexts, warned of the Government's manipulation of an individual's reasonable expectation of privacy, *see, United States* v. *Albarado,* 495 F. (2d) 799, 807 note 14 (2nd Cir. 1974); *United States* v. *Kim, supra,* at 1256–57; *cf., Collier* v. *Miller,* 414 F. Supp. 1357, 1366 (D. Tex. 1976),[9] and they may accordingly look with disfavor upon a notice of television surveillance intended to alter the expectations of a large number of employees.

### B.

A second justification advanced for conducting warrantless surreptitious television surveillance of Government employees is the "public" nature of the area to be surveilled. The Fourth Amendment will not protect information knowingly exposed to the public, even if the exposure occurs in a home or office. *Katz* v. *United States, supra,* at 351. Accordingly, if a particular employee's activities could be said to be exposed to the public, *see, United States* v. *Santana,* 427 U.S. 38, 42 (1976), surreptitious television surveillance may be conducted without a warrant.

Under this standard, certain places are so open to public observation that no justifiable expectation exists with respect to activities conducted there. For example, open fields, *see, Air Pollution Variance Board* v. *Western Alfalfa Corp.,* 416 U.S. 861 (1974), public streets, *see, United States* v. *Santana, supra,* and common areas of buildings generally open to the public, *see, United States* v. *Cruz Pagan,* 537 F. (2d) 554 (1st Cir.

---

[9] *See also* Amsterdam, *Perspectives on the Fourth Amendment,* 58 Minn. L. Rev. 349, 384 (1974); Note, 86 Yale L.J. 1461, 1475, 1498 (1977).

1976), have been held, in given contexts, to be such public areas. This doctrine has been applied to uphold surreptitious television monitoring of a public place. *See, Sponik* v. *City of Detroit Police Department, supra* (tavern); *see also, Poore* v. *State of Ohio, supra* (public washroom). We believe that, as a general rule, warrantless surreptitious television surveillance may be used to monitor activity conducted in public areas. *Cf., United States* v. *Brooks,* 567 F. (2d) 134 (D.C. Cir. 1977) (camera surveillance of customers in a "Sting" operation); *United States* v. *Mitchell,* 538 F. (2d) 1230 (5th Cir. 1976) (*en banc*) (videotaping of activities in public parking lot).

However, several caveats are in order. First, even though an area may be usually thought as open to public view, under special circumstances even these areas may afford a reasonable expectation of privacy. *See, United States* v. *FMC Corporation,* 428 F. Supp. 615, 618 (W.D. N.Y. 1977) ("open fields" doctrine not applicable to a lagoon with highly restricted access). Second, even though an individual is in an area where his activities are open to public view, he still may reasonably expect that his privacy is protected against certain types of investigations such as the use of a beeper on his clothing, *cf., United States* v. *Holmes, supra,* at 866, or the use of a powerful microphone to hear his conversations far removed from those who could normally overhear him.

A different situation exists regarding Government offices or working spaces generally not open to public view. As we have already outlined, an individual in a private office has a greater justifiable expectation of privacy, at least with respect to surreptitious electronic monitoring. *United States* v. *Hagarty, supra.* The more troublesome questions arise with respect to offices that are occupied by two or more employees or spaces that are entered at times by others.

Joint occupation or frequent entry does not automatically preclude a reasonable expectation of privacy. *Katz* made clear "what [an individual] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." 389 U.S. at 351–52. Under this standard, although an individual's activity is subject to the view of those who share or enter his office, he still may enjoy reasonable expectation of privacy due to such factors as the configuration of the office or an individual's knowledge of the habits of others in the office. Indeed, the subject's ability to shield his activities from others' view is generally the reason for installing a continuous monitoring system to investigate his actions. We do not believe that the fact that an office is shared or subject to entry by others will always allow the Government to install surreptitious television surveillance without a warrant. A recent decision by the Ninth Circuit adopts this view. *United States* v. *McIntyre,* 582 F. (2d) 1221, 1224 (9th Cir. 1978).

This conclusion is bolstered by recent developments in Fourth Amendment law concerning reasonable expectations of privacy in public places. It appears that, even though an individual is in a public place, he may still

71

retain a reasonable expectation of privacy with respect to certain forms of investigation. This principle is evident in *Katz* itself: while an individual in a public telephone booth is subject to visual surveillance (or to eavesdropping unaided by artificial techniques, see *United States* v. *Fuller*, 441 F. (2d) 755, 760–61 (4th Cir. 1971)), he may not be subjected to electronic surveillance without a warrant. In the same manner, several courts have indicated that although a person driving in public is not free from visual observation, he may reasonably assume that he is not being monitored by a "beeper." *See, United States* v. *Moore,* 562 F. (2d) 106, 112 (1st Cir. 1977); *United States* v. *Holmes, supra,* at 866;[10] *but see, United States* v. *Hufford,* 539 F. (2d) 32 (9th Cir. 1976).

The above cases show that the lack of reasonable expectations with regard to one form of surveillance does not necessarily forfeit the reasonable expectations with regard to other forms of surveillance. Rather, any inquiry into a reasonable expectation of privacy must take into account a person's expectations both to his surroundings and to the methods of investigation that may be utilized in those surroundings. The use of surreptitious monitoring may not be justified solely by the occasional presence of others in the same room, because the subject could still reasonably expect to be free from surreptitious monitoring and because the Government has not routinely used this type of investigatory technique to date to monitor its employees' activities. *People* v. *Triggs, supra.* The decision in *Hagarty* supports this view. Just as the Government might not conduct continual surveillance of oral communications by electronic means, neither can it maintain continual visual surveillance by electronic means.[11]

Even though at least one court has upheld the use of television surveillance on the basis of consent of others in the room, *Avery* v. *State, supra,* we do not believe that this factor will necessarily alter our conclusion. As discussed above, the doctrine of consent is predicated on the rationale that the targeted individual is voluntarily disclosing his activities or communications to those around him. This rationale would allow surveillance of those activities that the target freely allowed others to see. However, the rationale would have no application to activities that the target was not voluntarily leaving open to others and which he might in fact succeed in preventing others from seeing. In such instances the

---

[10] *See also, United States* v. *Choate,* 422 F. Supp. 261, 269 (C.D. Cal. 1976); *People* v. *Triggs, supra; People* v. *Smith,* 67 Cal. App. 3d 638, 654 (1977) (beeper on plane); *People* v. *Sneed, supra,* at 541.

[11] For this reason we do not believe that the result in *Poore* v. *State of Ohio, supra,* retains all of its validity today. The court there upheld police observations and movies from behind a two-way glass in a restroom on the basis that any member of the public could have walked in and made the same observation. The approach in *Katz* may alter this result by looking to the reasonable expectations of those using public restrooms, and some courts have explicitly so held. *See, Kroehler* v. *Scott, supra; People* v. *Triggs, supra.* Moreover, even if one has no reasonable expectations with regard to the public, he may still have a reasonable expectation with regard to police use of two-way mirrors and cameras.

surveillance is not merely securing evidence that would be otherwise available, but collecting evidence that the Government could not obtain at all from the consenting individuals. Indeed, this seems to be the very purpose of surreptitious television surveillance.

## Conclusion

It is apparent from the above discussion that few, if any, definitive conclusions can be made with regard to the general use of surreptitious television surveillance without a warrant. Rather, the question whether such surveillance will amount to a "search," and thus be subject to the strictures of the Fourth Amendment or of various statutes that adopt Fourth Amendment standards, must depend on all the facts and circumstances of a particular situation. A particularized study of these facts and circumstances must be conducted in each case to determine whether judicial authorization must be obtained.[12]

We recommend that the responsibility for screening proposed television surveillance for law enforcement purposes be lodged in a Deputy Assistant Attorney General for the Criminal Division. Where such surveillance is proposed for foreign intelligence purposes, this same responsibility should be vested in the Chief Attorney of the Investigation Review Unit. If, on the basis of this screening, the responsible official concludes that the surveillance would not intrude on the target's justifiable expectations of privacy, we suggest that he then be vested with the authority to approve the surveillance. If the surveillance would infringe on the target's justifiable expectations of privacy, he should be required to initiate proceedings for securing judicial authorization or, in cases involving foreign intelligence, appropriate executive approval.

We further recommend that guidelines for the screening in the Criminal Division and the Investigation Review be formulated in order to ensure that the screening in the Criminal Division and the Investigation Review Unit is conducted on a consistent basis.

JOHN M. HARMON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[12] In certain foreign intelligence situations—*e.g.,* overseas surveillance—the approval of the President or his designee might take the place of judicial authorization in the absence of legislation.