UNITED STATES of America,

v.

Usama BIN LADEN, a/k/a "Usamah Bin–Muhammad Bin–Ladin," a/k/a "Shaykh Usamah Bin–Ladin," a/k/a "Abu Abdullah," a/k/a "Mujahid Shaykh," a/k/a "Hajj," a/k/a "Abdul Hay," a/k/a "al Qaqa," a/k/a "the Director," a/k/a "the Supervisor," a/k/a "the Contractor," Muhammad Atef, a/k/a "Abu Hafs," a/k/a "Abu Hafs el Masry," a/k/a "Abu Hafs el Masry el Khabir," a/k/a "Taysir," a/k/a "Sheikh Taysir Abdullah," a/k/a "Abu Fatimah," a/k/a "Abu Khadija," Ayman Al Zawahiri, a/k/a "Abdel Muaz," a/k/a "Dr. Ayman al Zawahiri," a/k/a "the Doctor," a/k/a "Nur," a/k/a "Ustaz," a/k/a "Abu Mohammed," a/k/a "Abu Mohammed Nur al-Deen," Mamdouh Mahmud Salim, a/k/a "Abu Hajer al Iraqi," a/k/a "Abu Hajer," Khaled Al Fawwaz, a/k/a "Khaled Abdul Rahman Hamad al Fawwaz," a/k/a "Abu Omar," a/k/a "Hamad," Ali Mohamed, a/k/a "Ali Abdelseoud Mohamed," a/k/a "Abu Omar," a/k/a "Omar," a/k/a "Haydara," a/k/a "Taymour Ali Nasser," a/k/a "Ahmed Bahaa Eldin Mohamed Adam," Wadih El Hage, a/k/a "Abdus Sabbur," a/k/a "Abd al Sabbur," a/k/a "Wadia," a/k/a "Abu Abdullah al Lubnani," a/k/a "Norman," a/k/a "Wa'da Norman," a/k/a "the Manager," a/k/a "Tanzanite," Ibrahim Eidarous, a/k/a "Ibrahim Hussein Abdelhadi Eidarous," a/k/a "Daoud," a/k/a "Abu Abdullah," a/k/a "Ibrahim," Adel Abdel Bary, a/k/a "Adel Mohammed Abdul Almagid Abdel Bary," a/k/a "Abbas," a/k/a "Abu Dia," a/k/a "Adel," Fazul Abdullah Mohammed, a/k/a "Harun," a/k/a "Harun Fazhl," a/k/a "Fazhl Abdullah," a/k/a "Fazhl Khan," Mohamed Sadeek Odeh, a/k/a "Abu Moath," a/k/a "Noureldine," a/k/a "Marwan," a/k/a "Hydar," a/k/a "Abdullbast Awadah," a/k/a "Abdulbasit Awadh Mba-

rak Assayid," Mohamed Rashed Daoud Al-'Owhali, a/k/a "Khalid Salim Saleh Bin Rashed," a/k/a "Moath," a/k/a "Abdul Jabbar Ali Abdel–Latif," Mustafa Mohamed Fadhil, a/k/a "Mustafa Ali Elbishy," a/k/a "Hussein," a/k/a "Hussein Ali," a/k/a "Khalid," a/k/a "Abu Jihad," Khalfan Khamis Mohamed, a/k/a "Khalfan Khamis," Ahmed Khalfan Ghailani, a/k/a "Fupi," a/k/a "Abubakary Khalfan Ahmed Ghailani," a/k/a "Abubakar Khalfan Ahmed," Fahid Mohammed Ally Msalam, a/k/a "Fahad M. Ally," Sheikh Ahmed Salim Swedan, a/k/a "Sheikh Bahamadi," a/k/a "Ahmed Ally," Defendants.

No. S(7) 98 CR.1023(LBS).

United States District Court,
S.D. New York.

Dec. 5, 2000.

266

268

Mary Jo White, United States Attorney, New York City, Kenneth M. Karas, Patrick J. Fitzgerald, Michael J. Garcia, Paul W. Butler, Andrew McCarthy, Assistant United States Attorneys, for the Southern District of New York.

Sam A. Schmidt, Joshua L. Dratel, Kristian K. Larsen, New York City, for Defendant El–Hage.

Frederick H. Cohn, Laura Gasiorowski, David Preston Baugh, New York City, for Defendant Al-'Owhali.

Jeremy Schneider, David Stern, David Ruhnke, New York City, for Defendant Khamis Mohamed.

Anthony L. Ricco, Edward D. Wilford, Carl J. Herman, Sandra A. Babcock, New York City, for Defendant Odeh.

## OPINION [1]

SAND, District Judge.

The Defendants are charged with numerous offenses arising out of their alleged participation in an international terrorist organization led by Defendant Usama Bin Laden and that organization's alleged involvement in the August 1998 bombings of the United States Embassies in Nairobi, Kenya and Dar es Salaam, Tanzania. Presently before the Court are Defendant El–Hage's motions which seek the following: suppression of evidence seized from the search of his residence in Nairobi, Kenya in August 1997 and suppression of evidence obtained from electronic surveillance, conducted from August 1996 to August 1997, of four telephone lines in Nairobi, Kenya.[2]

### BACKGROUND

A detailed factual background of this case was set forth in the Court's memorandum and order addressing the Defendants' request for a bill of particulars. *See United States v. Bin Laden,* 92 F.Supp.2d 225, 228 (S.D.N.Y.2000). For the purpose of resolving these motions, however, it is necessary to review some of the relevant facts before proceeding.

The charges currently pending against each of the Defendants in this case arise from their alleged involvement with an international terrorist organization known as "al Qaeda" or "the Base." (Indictment S(7) 98 Cr. 1023(LBS) ("Indictment") ¶ 1.) Since its emergence in 1989, al Qaeda is

1. This opinion is being filed initially under seal. It will be unsealed on December 19, 2000 unless the Court is advised in writing on or before that date that there is good reason why it should continue to be under seal. Appendices A & B will continue to be under seal until January 22, 2001 when they will be publicly filed unless the Court is advised in writing on or before that date that some portion or all of the Appendices should continue to be under seal beyond that date.

2. El–Hage also seeks additional relief, including: suppression of statements made by the Defendant to United States law enforcement agents, on August 21, 1997, at Kenyatta International Airport in Nairobi, Kenya; dismissal of the Indictment or suppression of evidence in light of the Government's allegedly outrageous conduct during its investigation of the Defendant; partial disqualification of Assistant United States Attorney Patrick Fitzgerald; suppression of tape recordings or summaries of telephone conversations which are the product of electronic surveillance conducted in Arlington, Texas, pursuant to the Foreign Intelligence Surveillance Act, during August and September, 1998; and sanctions against the Government for destruction of tape recordings of the electronic surveillance conducted, pursuant to the Foreign Intelligence Surveillance Act ("FISA"), in August and September, 1998. These issues will be addressed in a subsequent opinion.

alleged to have planned and financed (both independently and in association with other terrorist groups) numerous violent attacks against United States personnel and property abroad. (*Id.* ¶¶ 1, 12.) The United States Attorney's Office in the Southern District of New York has been investigating al Qaeda since at least 1996. (*Id.* ¶ 72; *see also* Affirmation of Patrick J. Fitzgerald of Jan. 24, 2000 ¶ 6 (dating the involvement of the United States Attorney's involvement in the investigation to late 1995 or early 1996).) In the spring of 1996, Bin Laden, the founder and leader of al Qaeda (Indictment ¶ 1) was identified by the United States Government as "a serious threat to national security" (Government Response ("Resp.") at 2).

Among other things, the Government alleges that al Qaeda coordinates the activities of its global membership, sends its members to camps for military and intelligence training, obtains and transports weapons and explosives, and explicitly provides Muslims with religious authority for acts of terrorism against American citizens. (*Id.* ¶ 12.) In August 1996, Bin Laden "effectively declared a war of terrorism against all members of the United States military worldwide." (Resp. at 2.) In February of 1998, this declaration was expanded to include attacks on American civilians. (*Id.*) Al Qaeda, which has at different points in its history been headquartered in Afghanistan, Pakistan and the Sudan, has maintained an international presence through "cells" (and al Qaeda personnel) located in a number of countries including Kenya, Tanzania, the United Kingdom, Canada and the United States. (Indictment ¶ 5.)

By the late spring of 1996, the United States intelligence community ("Intelligence Community") became aware that persons associated with Bin Laden's organization had established an al Qaeda presence in Kenya. (Resp. at 2.) In addition, the Intelligence Community had isolated and identified five telephone numbers which were being used by persons associated with al Qaeda. (*Id.*) All five of these phone lines were monitored by the Intelligence Community from August 1996 through August 1997. (*Id.* at 3.) One of these phone lines was located in an office in the same building where the Defendant, El–Hage, and his family resided. (*Id.* at 2.) (El–Hage, an American citizen, and his family lived in Nairobi from 1994 to 1997. (Schmidt Aff. ¶¶ 16, 62–63.)) Another of the phone lines, was a cellular phone used by El–Hage and others. (*Id.* ¶ 23.)

On April 4, 1997, the Attorney General authorized the collection of intelligence specifically targeting El–Hage. (Resp. at 4.) This authorization was renewed on July 3, 1997. (*Id.*) On August 21, 1997, American and Kenyan officials conducted a search of the Defendant's residence. (Schmidt Aff. ¶ 38.) The Defendant's wife (the Defendant was not present during the search) was shown a document which was identified as a Kenyan warrant authorizing a search for "stolen property." (*Id.* ¶ 37; *see also* Resp. at 4.) The American officials who participated in the search did not, however, "rely upon the Kenyan warrant as the legal authority for the search." (Resp. at 4.) At the end of the search, the Defendant's wife was given an inventory by one of the Kenyan officers present which enumerated the items which had been seized during the search. (Schmidt Aff. ¶ 40; *see also* Coleman Aff. ¶ 4).

## ANALYSIS

The Defendant seeks suppression of the evidence which was seized during the warrantless search of his home in Kenya and the fruits thereof. In addition, he seeks the suppression of evidence derived from electronic surveillance of several telephone lines over which his conversations were recorded, including the telephone for his Nairobi residence and his cellular phone. The Defendant also asks that the Court

hold a hearing with respect to the validity of the surveillance and the search.

El–Hage bases his challenge to the evidence on the Fourth Amendment[3] and asserts that the search and the electronic surveillance were unlawful because they were not conducted pursuant to a valid warrant. If the Court accepts the Government's argument that no warrant was required, El–Hage argues, in the alternative, that the searches[4] were unreasonable. In its response to the Defendant's motion, the Government asserts that the searches were primarily conducted for the purpose of foreign intelligence collection and are, therefore, not subject to the Warrant Clause of the Fourth Amendment. As a result, it is the Government's position that the aforementioned evidence should not be suppressed. In addition, the Government claims that no hearing is necessary.

El–Hage's suppression motion raises significant issues of first impression concerning the applicability of the full panoply of the Fourth Amendment to searches conducted abroad by the United States for foreign intelligence purposes and which are directed at an American citizen believed to be an agent of a foreign power. Although numerous courts and Congress have dealt with searches in the United States for foreign intelligence purposes and other courts have dealt with searches of foreigners abroad, we believe this to be the first case to raise the question whether an American citizen acting abroad on behalf of a foreign power may invoke the Fourth Amendment, and especially its warrant provision, to suppress evidence obtained by the United States in connection with intelligence gathering operations.

## I. Application of the Fourth Amendment Overseas

Before proceeding to that Fourth Amendment analysis, it is necessary to ascertain whether the Amendment applies in this situation. El–Hage is an American citizen and the searches at issue were conducted in Kenya. The Defendant argues that the protection of the Fourth Amendment "does not dissolve once a United States citizen leaves the borders of the United States." (El–Hage Mot. at 4.) The Government seems to concede the general applicability of the Fourth Amendment to American citizens abroad, but asserts that the particular searches contested in this case (which were conducted overseas to collect foreign intelligence) call for a more limited application of the Amendment.

The Supreme Court cases on point suggest that the Fourth Amendment applies to United States citizens abroad. *See Reid v. Covert,* 354 U.S. 1, 5–6, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) (plurality opinion) (stating, in a case involving the Fifth and Sixth Amendments, that the "shield" provided to an American citizen by the Bill of Rights "should not be stripped away just because he happens to be in another land"). *Cf. United States v. Verdugo–Urquidez,* 494 U.S. 259, 265, 271, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990) (holding that aliens outside the United States who lack a "substantial connection" to this country do not enjoy the protection of the Fourth Amendment because they are not "the people" whose protection was contemplated by the framers of the Fourth Amendment). Thus, this Court finds that even though the searches at issue in this case occurred in Kenya, El–Hage can bring a

3. The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV.

4. When referring to the physical search and the electronic surveillance together, the Court will use the term "searches" unless there is a need to distinguish between the two. Whether these two Fourth Amendment events merit different levels of scrutiny is a question that will be addressed later in this opinion. *See infra* Section IV. A.

Fourth Amendment challenge. However, the extent of the Fourth Amendment protection, in particular the applicability of the Warrant Clause, is unclear.[5]

## II. An Exception to the Warrant Requirement for Foreign Intelligence Searches

The Government urges that the searches at issue in this case fall within an established exception to the warrant requirement.[6] According to the Government, searches conducted for the purpose of foreign intelligence collection which target persons who are agents of a foreign power do not require a warrant. The Defendant asserts that such an exception does not exist and should not be recognized by this Court.

The Supreme Court has acknowledged but has not resolved this issue. *See United States v. United States District Court (Keith )*, 407 U.S. 297, 321–22, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) (holding that there is no warrant exception for "domestic security" surveillances but explicitly stating that the Court had "not addressed, and express[ed] no opinion as to, the issues which may be involved with respect to activities of foreign powers or

their agents"). Circuit courts applying *Keith* to the foreign intelligence context have affirmed the existence of a foreign intelligence exception to the warrant requirement for searches conducted within the United States which target foreign powers or their agents. *See United States v. Clay*, 430 F.2d 165, 171 (5th Cir.1970) (upholding warrantless foreign intelligence surveillance); *United States v. Brown*, 484 F.2d 418, 426 (5th Cir.1973) ("Restrictions upon the President's power which are appropriate in cases of domestic security become artificial in the context of the international sphere."); *United States v. Butenko*, 494 F.2d 593, 605 (3d Cir.1974) (upholding warrantless foreign intelligence surveillance and relying on the "good faith' of the Executive and the sanctions for illegal surveillances incident to post-search criminal or civil litigation"); *United States v. Buck*, 548 F.2d 871, 875 (9th Cir.1977) ("Foreign security wiretaps are a recognized exception to the general warrant requirement."); *United States v. Truong Dinh Hung*, 629 F.2d 908, 913 (4th Cir.1980) (finding that a requirement that officials secure a warrant before these types of searches "would 'unduly frustrate' the President in carrying out his foreign affairs responsibilities"). The

---

5. As already stated, El–Hage asks this Court to suppress the evidence obtained from the searches and the fruits thereof. The Government takes the position that the exclusionary rule should not be applied because the government officials acted in good faith. Indeed, the Government suggests that El Hage's motion could be disposed of "solely" on this basis "without reaching the validity of the searches at issue." Resp. at 62 (relying in part on *United States v. Ajlouny*, 629 F.2d 830, 840 (2d Cir.1980) (determining that because officers acted in good faith belief that foreign intelligence exception applied, court need not reach the question of the validity of the exception)). *Ajlouny* is distinguishable from this case because it immediately preceded the enactment of FISA. *See* 50 U.S.C. §§ 1801–1811 (1978). The *Ajlouny* court reasoned that the potential for deterrence was significantly changed by the enactment of FISA (which outlines procedures for foreign intelligence surveillance conducted within the United States) and concluded that "the passage of the Act substantially reduced the im-

portance of deciding in this case whether the Constitution independently requires the obtaining of a warrant for foreign intelligence electronic surveillance." *Id.* at 842.

The Court has determined that with the exception of the pre-April 4, 1997 electronic surveillance, there was no Fourth Amendment violation. As such, the Court finds it unnecessary to consider the question of good faith, except with respect to the pre-April 4, 1997 surveillance, which is dealt with later in the opinion. *See infra* Section III. B.

6. It is important to note at the outset of this Fourth Amendment analysis that a Kenyan warrant was presented to Mrs. El–Hage during the physical search of the Nairobi residence, but the Government explicitly states that "American authorities ... did not rely upon the Kenyan warrant as legal authority for the search." Resp. at 4. Therefore, the question of the relative levels of participation of the two sovereigns (Kenya and the United States) is not presented here.

Second Circuit and the D.C. Circuit have commented on but not decided this question.[7] No court has considered the contours of such an exception when the searches at issue targeted an American citizen overseas.[8]

The question, for this Court, is twofold. First, it is necessary to evaluate whether there is an exception to the warrant requirement for searches conducted abroad for purposes of foreign intelligence collection. Second, if such an exception exists, the Court must evaluate whether the searches conducted in this case properly fall within the parameters of that exception.

## A. The Constitutional and Practical Bases for the Exception

■ Because the Second Circuit has not confirmed the existence of a foreign intelligence exception to the warrant requirement and because no other court has considered the applicability of such an exception overseas, the factors which call for the adoption of the exception are reviewed here.

### 1. The President's Power Over Foreign Affairs

■ In all of the cases finding an exception to the warrant requirement for for-

eign intelligence collection, a determinative basis for the decision was the constitutional grant to the Executive Branch of power over foreign affairs. On numerous occasions, the Supreme Court has addressed the constitutional competence of the President in the field of foreign affairs. *See, e.g., Chicago & Southern Air Lines, v. Waterman S.S. Corporation,* 333 U.S. 103, 111, 68 S.Ct. 431, 92 L.Ed. 568 (1948) (explaining that the judiciary should not interfere with the "delicate" and "complex" decisions of foreign policy which are "wholly confided by our Constitution to the political departments of the government, Executive and Legislative"); *United States v. Curtiss-Wright,* 299 U.S. 304, 320, 57 S.Ct. 216, 81 L.Ed. 255 (1936) (discussing the "very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations"). It is also generally recognized that this authority includes power over foreign intelligence collection. *See Totten v. U.S.,* 92 U.S. 105, 106, 2 Otto 105, 23 L.Ed. 605 (1875) (recognizing the President's power to conduct intelligence operations and to employ secret agents); *Webster v. Doe,* 486 U.S. 592, 605–06, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988) (O'Connor, J., concurring in part, dissenting in part) (de-

---

**7.** *See Birnbaum v. United States,* 588 F.2d 319, 332 n. 26 (2d. Cir.1978) (stating in dicta that the warrantless mail openings at issue "might" have been lawful if conducted pursuant to authorization of the President (in light of his Article II power to conduct foreign affairs)); *Ajlouny,* 629 F.2d at 840 (pre-FISA case finding that officers acted in good faith reliance on the foreign intelligence exception to the warrant requirement, but deferring consideration of the constitutionality of such exception); *United States v. Duggan,* 743 F.2d 59, 71 (2d Cir.1984) (acknowledging that before FISA "virtually every court that had addressed the issue had concluded that the President had the inherent power to conduct warrantless electronic surveillance to collect foreign intelligence information"). *See Ellsberg v. Mitchell,* 709 F.2d 51, 65–66 (D.C.Cir.1983)(forestalling resolution of the issue of a foreign intelligence exception to the warrant requirement because of an undeveloped factual record); *United States v. Ehrlich-*

*man,* 546 F.2d 910, 936 (D.C.Cir.1976) (noting in dicta that "no court has ruled that the President does not have [the prerogative to authorize warrantless foreign intelligence collection] in a case involving foreign agents or collaborators with a foreign power"). *Cf. Zweibon v. Mitchell,* 516 U.S. 594 (D.C.Cir. 1975) (refusing to apply foreign intelligence exception where searches targeted people who were not agents or affiliates of a foreign power).

**8.** All of the circuit cases finding a foreign intelligence exception arose before the enactment of FISA (which sets forth procedures for foreign intelligence collection, *see* 50 U.S.C. § 1801 et seq.) and are probably now governed by that legislation. FISA only governs foreign intelligence searches conducted within the United States. See 50 U.S.C.A. §§ 1801(f)(1–4), 1803(a), 1821(5), 1822(c).

scribing, in civil employment suit, "[t]he functions performed by the Central Intelligence Agency and the Director of Central Intelligence" as "at the core" of the President's foreign relations power).

■ At the same time, in these cases and others, the Supreme Court has established that even in the exercise of his foreign affairs power, the President is constrained by other provisions of the Constitution. *See United States v. Robel,* 389 U.S. 258, 264, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967) ("It would indeed be ironic if, in the name of national defense, we would sanction the subversion of one of those liberties—the freedom of association—which makes the defense of the Nation worthwhile."); *United States v. Curtiss-Wright,* 299 U.S. 304, 320, 57 S.Ct. 216, 81 L.Ed. 255 (1936)·(explaining that the President's power over foreign affairs, "like every other governmental power, must be exercised in subordination to the applicable provisions of the Constitution"). Thus, even if this Court deems it necessary to establish an exception to the warrant requirement for foreign intelligence collection, these cases require vigilant protection of the Fourth Amendment interests which are at stake.

Warrantless foreign intelligence collection has been an established practice of the Executive Branch for decades. (Resp. at 69.) *See also Keith,* 407 U.S. at 310, 92 S.Ct. 2125 (finding that warrantless electronic surveillance "has been sanctioned more or less continuously by various Presidents and Attorneys General since July 1946"); William F. Brown and Americo R. Cinquegrana, *Warrantless Physical Searches for Foreign Intelligence Purposes: Executive Order 12,333 and the Fourth Amendment,* 35 Cath. U.L.Rev. 97, 103 (1985) ("Warrantless electronic surveillance has been used by the Executive to collect intelligence information since at least the mid-1800s ... Warrantless physical searches have been used for a much longer period of time."). Congress has legislated with respect to domestic inci-

dents of foreign intelligence collection, *see* FISA, 50 U.S.C. §§ 1801 et seq. (1978), but has not addressed the issue of foreign intelligence collection which occurs abroad. The Supreme Court has remained, in the three decades since *Keith,* essentially, silent on both aspects of the issue. *But cf. Verdugo-Urquidez,* 494 U.S. at 273–74, 110 S.Ct. 1056 (noting that a warrant requirement for overseas searches "could significantly disrupt the ability of the political branches to respond to foreign situations involving our national interest"). While the fact of this silence is not dispositive of the question before this Court, it is by no means insignificant. *See Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 610, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) ("[A] systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned, engaged in by Presidents who have also sworn to uphold the Constitution, making as it were such exercise of power part of the structure of our government, may be treated as a gloss on 'Executive Power' vested in the President by § 1 of Art. II."); *Payton v. New York,* 445 U.S. 573, 600, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) ("A longstanding, widespread practice is not immune from constitutional scrutiny. But neither is it to be lightly brushed aside.").

## 2. The Costs of Imposing a Warrant Requirement

■ It is generally the case that imposition of a warrant requirement better safeguards the Fourth Amendment rights of citizens in the Defendant's position. But several cases direct that when the imposition of a warrant requirement proves to be a disproportionate and perhaps even disabling burden on the Executive, a warrant should not be required. *See Truong,* 629 F.2d at 913 (finding that a requirement that officials secure a warrant before these types of searches "would 'unduly frustrate' the President in carrying out his foreign affairs responsibilities"); *Keith,* 407 U.S. at 315, 92 S.Ct. 2125· ("We must also ask

whether a warrant requirement would unduly frustrate the efforts of Government to protect itself from acts of subversion and overthrow directed against it."). *See also Griffin v. Wisconsin,* 483 U.S. 868, 876, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987) (finding that a warrant requirement would interfere with the supervision of probationers and would impede the responsiveness of probation officers); *Skinner v. Railway Labor Executives Ass'n,* 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) ("The Government's interest in regulating the conduct of railroad employees to ensure safety ... presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements."); *Camara v. Municipal Court,* 387 U.S. 523, 533, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (holding that the imposition of the warrant requirement "depends in part upon whether the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search."). For several reasons, it is clear that imposition of a warrant requirement in the context of foreign intelligence searches conducted abroad would be a significant and undue burden on the Executive.

It has been asserted that the judicial branch is ill-suited to the task of overseeing foreign intelligence collection. Foreign affairs decisions, it has been said, are often particularly complex. *See Chicago & Southern Air Lines,* 333 U.S. at 111, 68

S.Ct. 431 (explaining that foreign affairs decisions are "of a kind for which the Judiciary has neither aptitude, facilities nor responsibility"). These arguments have, to some extent, been undercut by both the Supreme Court, in *Keith,* and Congress, in FISA.[9] On the other hand, neither *Keith* nor FISA addresses the particular difficulties attendant to *overseas* foreign intelligence collection. In fact, as mentioned previously, it was precisely these peculiarities which caused Congress to restrain the reach of FISA to domestic searches.[10] The Government makes several persuasive points about the intricacies of foreign intelligence collection conducted abroad. First, the Government cautions that a court would have greater difficulty (than in the domestic context) predicting "the international consequences flowing from a decision on the merits' regarding Executive Branch foreign policy decisions." (Resp. at 41.) Often these decisions have significant impacts on the essential cooperative relationships between United States officials and foreign intelligence services. (*Id.*) In addition, when some members of the government of the country in which the searches are sought to be conducted are perceived as hostile to the United States or sympathetic to the targets of the search, a procedure requiring notification to that government could be self-defeating. The Government also explains that too much involvement could

---

**9.** In *Keith,* the Court did not accept the argument that the task, at least in the context of domestic, national security surveillance, was beyond the ken of the judiciary. *See Keith,* 407 U.S. at 319, 92 S.Ct. 2125. Congress, by enacting a statute which calls for judicial oversight of foreign intelligence surveillance, albeit in a modified form, also does not appear to have adopted this view of judicial unsuitability. *See* 50 U.S.C. §§ 1801 et seq. (1978).

**10.** There is a limited record of why Congress confined FISA to surveillances and searches occurring within the United States. One Senate Report regarding the original (1978) FISA bill noted that "legislation [governing foreign intelligence surveillance abroad] should be

considered separately because the issues are different than those posed by electronic surveillance within the United States." S. REP. NO. 95–701, at 7 n. 2 (1978). See also *Foreign Intelligence Electronic Surveillance: Hearings Before the Subcommittee on Legislation,* 95th Cong. 12–13 (1978) (statement of Attorney General Griffin Bell) ("[B]ecause 'there is a fair degree of cooperation between our Government and the police and intelligence services of other nations, limitations on [overseas foreign intelligence] surveillances could result in the loss of cooperation.'"); H.R. REP. 95–1283, at 27–28 ("[C]ertain problems and unique characteristics preclude the simple extension of [FISA] to overseas surveillances.").

place American courts in an "institutionally untenable position" when the operations which are authorized are violative of foreign law. (*Id.* at 42.)

These concerns about the complexity of foreign intelligence decisions should not be taken to mean that the judiciary is not capable of making these judgments. Judges will, of course, be called on to assess the constitutionality of these searches ex post. Requiring judicial approval in advance, however, would inevitably mean costly increases in the response time of the Executive Branch. Although the Defendant asserts that such concerns are accommodated by existing allowances for exigent circumstances,[11] the Court is not persuaded that the exigent circumstances doctrine provides enough protection for the interests at stake. *See Truong,* 629 F.2d at 913 ("[A] warrant requirement would add a procedural hurdle that would reduce the flexibility of executive foreign intelligence initiatives [and] in some cases delay executive response to foreign intelligence threats."); *Butenko,* 494 F.2d at 605 (concluding that imposition of a warrant requirement would interfere with the "continuous flow of [foreign intelligence] information" thus making the "Executive's foreign policy-making apparatus" less efficient).

In addition to concerns about the impact of a warrant requirement on the speed of the executive response, there is an increased possibility of breaches of security when the Executive is required to take the Judiciary into its confidence.[12] The Government emphasizes the detrimental impact that the existence of a warrant requirement for foreign intelligence searches might have on the cooperative relationships which are integral to overseas foreign intelligence collection efforts. As the Government explains, "[t]he mere *perception* that inadvertent disclosure is more likely is sufficient to obstruct the intelligence collection imperative." (Resp. at 45.) The United States' heightened dependence on foreign governments for assistance in overseas foreign intelligence collection is a concern that was not addressed by the circuit courts that considered an exception to the warrant requirement for foreign intelligence collection within this country.

### 3. The Absence of a Warrant Procedure

The final consideration which persuades the Court of the need for an exception to the warrant requirement for foreign intelligence collection conducted overseas is that there is presently no statutory basis for the issuance of a warrant to conduct searches abroad.[13] (Resp. at 68.) In addi-

---

11. Several cases have provided for an exception to the warrant requirement in the context of an exigency. *See, e.g., Warden v. Hayden,* 387 U.S. 294, 298–99, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) ("The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others."); *Michigan v. Tyler,* 436 U.S. 499, 509, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978) ("Our decisions have recognized that a warrantless entry by criminal law enforcement officials may be legal when there is compelling need for official action and no time to secure a warrant.").

12. Concerns about security obviously influenced the drafters of FISA who established special procedures for the authorization of foreign intelligence collection which are protective of the often highly sensitive informa-

tion involved in those cases. *See* 50 U.S.C. §§ 1801 et seq. (1978).

13. There is not even a statutory provision for standard law enforcement searches conducted abroad. Rule 41(a) of the Federal Rules of Criminal Procedure, which governs domestic law enforcement searches, limits the jurisdiction of a federal magistrate. In the 1990 Amendment notes, the Advisory Committee noted that the Supreme Court had considered, but not adopted, a proposed amendment to Rule 41(a) which would have provided a mechanism for issuing "warrants to search property outside the United States." The Advisory Committee noted that without such a rule, "it was unclear how federal officers might obtain warrants authorizing searches outside the district of the issuing magistrate." Similarly, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18

tion, existing warrant procedures and standards are simply not suitable for foreign intelligence searches.[14] The Defendant, nevertheless, argues strenuously that "if the government insists on exercising jurisdiction over conduct occurring extra-territorially, it must also abide by constitutional limitations on *its own* conduct in pursuing criminality in those same foreign locales." (El–Hage Mot. at 12.) *See also Best v. U.S.*, 184 F.2d 131, 138 (1st Cir.1950) ("Obviously, Congress may not nullify the guarantees of the Fourth Amendment by the simple expedient of not empowering any judicial officer to act on an application for a warrant."); *Berlin Democratic Club v. Rumsfeld*, 410 F.Supp. 144, 160 (D.D.C. 1976)("Rule 41(a) cannot limit or restrict the dictates of the Constitution to the United States, however, particularly when the Supreme Court has held those dictates applicable overseas."). El–Hage's argument is significantly undercut by clear language from the Supreme Court decision in *Verdugo–Urquidez. See* 494 U.S. at 274, 110 S.Ct. 1056 (6–3 decision) (noting that a warrant from an American magistrate "would be a dead letter outside the United States"). *See also Verdugo–Urquidez*, 494 U.S. at 278, 110 S.Ct. 1056 (Kennedy, J., concurring) (explaining that several factors counsel against overseas application of the warrant requirement including: "the ab-

sence of local judges or magistrates available to issue warrants, the differing and perhaps unascertainable conceptions of reasonableness and privacy that prevail abroad, and the need to cooperate with foreign officials"); *Verdugo–Urquidez*, 494 U.S. at 279, 110 S.Ct. 1056 (Stevens, J., concurring) (concluding that the Warrant Clause does not apply to overseas searches of noncitizen's homes because of the powerlessness of American magistrates to authorize such searches).

Despite El–Hage's assertions to the contrary (El–Hage Mot. at 12 n. 3) the language employed by the Justices in *Verdugo–Urquidez* who challenged the overseas application of the warrant requirement does not suggest that the criticisms were limited to cases involving noncitizens.[15] The Justices' skeptical remarks were universally critical of the impotence of American warrants overseas and were not explicitly limited to application to noncitizens. There was no indication that any of the Justices would espouse a different view of the warrant requirement for searches of Americans abroad.

Thus, although this Court does not accept as settled the Government's proposition that it is impossible to secure a warrant for overseas searches or surveillance[16] (Resp. at 8), it is clear that the

U.S.C. §§ 2510 et seq., which prescribes procedures for electronic surveillance for law enforcement purposes, includes no provision for overseas electronic surveillance. *See* U.S.C. § 2518. *See also United States v. Toscanino*, 500 F.2d 267, 280–81 (2d Cir.1974); *Berlin Democratic Club v. Rumsfeld*, 410 F.Supp. 144 (D.D.C.1976).

14. Even without their jurisdictional limitations, neither Rule 41 nor Title III would be well-suited to the foreign intelligence context because their traditional law enforcement-based requirements prove to be unsuitable analogs for foreign intelligence collection. They rely on a different probable cause standard, they both eventually require some form of notice to the targets of the search and they provide very limited security for the highly classified information that forms the basis for Executive action. *See United States v. Bel-*

*field*, 692 F.2d 141, 144 n. 8. (D.C.Cir.1982) (explaining that intelligence information often "has nothing to do with the contemplated commission of a crime" and that the notice provision imposed by traditional warrant procedures would hinder the use of the intelligence).

15. *But cf. United States v. Juda*, 797 F.Supp. 774, 782 (N.D.Ca.1992) ("The Supreme Court [in *Verdugo–Urquidez* ] ... did not decide whether a warrant may be required for searches conducted abroad against Americans, as opposed to foreigners.").

16. In its surreply to El–Hage's Reply Memorandum, the Government does allow for the possibility that "the applicability of the Warrant Clause does not hinge on Congress's willingness to create a warrant mechanism." (Surreply at 11 n. 9.) Several decisions have

acquisition would certainly have been impracticable given the absence of any statutory provisions empowering a magistrate to issue a warrant and the unsuitability of traditional warrant procedures to foreign intelligence collection. As an additional point, the people and agencies upon whom the Executive relies in the foreign intelligence context for information and cooperation would undoubtedly be wary of any warrant procedures that did not adequately protect sensitive foreign intelligence information.

## B. Adoption of the Foreign Intelligence Exception to the Warrant Requirement

In light of the concerns outlined here, the Court finds that the power of the Executive to conduct foreign intelligence collection would be significantly frustrated by the imposition of a warrant requirement in this context. Therefore, this Court adopts the foreign intelligence exception to the warrant requirement for searches targeting foreign powers (or their agents) which are conducted abroad. As has been outlined, no court, prior to FISA, that was faced with the choice, imposed a warrant requirement for foreign intelligence searches undertaken *within* the United States. With those precedents as guidance, it certainly does not appear to be unreasonable for this Court to refuse to apply a warrant requirement for foreign intelligence searches conducted *abroad.*

At the same time, the Court is mindful of the importance of the Fourth Amendment interests at stake. In keeping with the precedents reviewed above, the warrant exception adopted by this Court is narrowly drawn to include only those overseas searches, authorized by the President (or his delegate, the Attorney General), which are conducted primarily for foreign intelligence purposes and which target foreign powers or their agents. *See Truong,* 629 F.2d at 915–17. The protection of individual rights in this context is not a significant departure from that which is envisioned by the Fourth Amendment. All warrantless searches are still governed by the reasonableness requirement and can be challenged in ex post criminal or civil proceedings.

## C. Application of the Exception

Before the Court can find that the exception applies to this case, it is necessary to show, first, that Mr. El–Hage was an agent of a foreign power; second, that the searches in question were conducted "primarily" for foreign intelligence purposes; and finally, that the searches were authorized by the President or the Attorney General.

## 1. Agent of a Foreign Power

█ It is clear from the Court's review of the evidence contained in the classified DCI declaration and in the materials considered by the Attorney General in issuing authorization for the post-April 4, 1997 surveillance and the August 21, 1997 search of El–Hage's residence that there

outlined the power of the courts to issue warrants for subjects not governed by any statute. *See United States v. New York Tel. Co.,* 434 U.S. 159, 169 n. 14, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977) (discussing "an inherent power ... to issue search warrants under circumstances conforming to the Fourth Amendment"); *United States v. Torres,* 751 F.2d 875 (7th Cir.1984) ("[T]he power to issue a search warrant was historically, and is still today, an inherent (by which we mean simply a nonstatutory, or common law) power of a court of general jurisdiction.... Although Congress can limit the procedural authority of the federal courts ... until it does so with respect to a particular subject the courts retain their traditional powers."); *United States v. Falls,* 34 F.3d 674, 678 (8th Cir.1994) ("A court of general jurisdiction has inherent power to issue a search warrant within the limits set forth in the Fourth Amendment."). In some of these cases, the language used by the courts has suggested the possibility of extension of this common law doctrine to this case (where no court possesses statutory jurisdiction to issue a warrant overseas). *But see Weinberg v. United States,* 126 F.2d 1004, 1006 (2d Cir.1942) ("With very few exceptions, United States district judges possess no extraterritorial jurisdiction.").

was probable cause to suspect that El–Hage was an agent of a foreign power. The Court is also persuaded that al Qaeda was properly considered a foreign power. In reaching this conclusion, the Court relies on the definitions of "foreign power" and "agent of a foreign power" which were incorporated by Congress into FISA. *See* 50 U.S.C. § 1801(a)-(b).

## 2. Primarily for Foreign Intelligence Purposes

■ This exception to the warrant requirement applies until and unless the primary purpose of the searches stops being foreign intelligence collection. *See Truong*, 629 F.2d at 915. If foreign intelligence collection is merely *a* purpose and not the *primary* purpose of a search, the exception does not apply. *See id.* Similarly, if a reviewing judge finds that the Government officials were "looking for evidence of criminal conduct *unrelated* to the foreign affairs needs of a President, then he would undoubtedly hold the surveillances to be illegal and take appropriate measures." *Butenko*, 494 F.2d at 606 (emphasis added).

A foreign intelligence collection effort that targets the acts of terrorists is likely to uncover evidence of crime. *See United States v. Sarkissian*, 841 F.2d 959, 965 (9th Cir.1988) (" 'International terrorism,' by definition, requires the investigation of activities that constitute crimes."); *Truong*, 629 F.2d at 915–16 ("[A]lmost all foreign intelligence investigations are in part criminal investigations."). Recognizing this, courts have explicitly rejected a standard which would require that the Executive action be "solely" for foreign intelligence purposes [17] and have allowed for the "accumulation of evidence of criminal activity" if it is "incidental" to foreign intelligence collection. *Butenko*, 494 F.2d at 606. In *Truong*, the Fourth Circuit af-

firmed the Eastern District of Virginia's selection of a date after which the continuation of the surveillance at issue was deemed to be driven by law enforcement interests. *See Truong*, 629 F.2d at 916. The district court noted that, at the cutoff date that it selected, a criminal prosecution was well under way and there existed probable cause to charge the defendants with crimes. *See United States v. Humphrey*, 456 F.Supp. 51, 59 (E.D.Va.1978). In fact, by that point, officials from the criminal division of the Department of Justice were directing the continued course of the *Truong* investigations. *See id.* Concomitantly, the foreign intelligence purpose was rapidly evaporating. A signal to the district court that the search had ceased being primarily a foreign intelligence effort was that it began yielding little in the way of useful foreign intelligence information. *See id.*

■ The Government's submissions establish persuasively that the purpose, throughout the entire electronic surveillance of El–Hage and during the physical search of his Nairobi residence, was primarily the collection of foreign intelligence information about the activities of Usama Bin Laden and al Qaeda. There was no FBI participation in the electronic surveillance that took place. (Surreply at 8 n. 3.) Although there was an FBI agent present during the search of El–Hage's residence, the Court does not find that foreign intelligence collection ceased to be the primary purpose of that search. The Court's determination about the purpose of the residential search is, in part, dependent upon the Government's classified submissions. For that reason, further analysis of this question is included in Classified Appendix A. The Court hereby directs the Government to institute proceedings to declassify Appendix A. *See supra* n. 1.

---

17. In *Butenko*, as El–Hage cites (Reply at 30) the court quoted twice the district court's finding that the surveillances at issues " 'were conducted and maintained solely for the purpose of gathering foreign intelligence infor-

mation.' " 494 F.2d at 601, 605. But the *Butenko* court did not incorporate "solely" into the test that it created for the warrant exception. Rather, the court described the test as one of "primary" purpose. *Id.* at 606.

In particular, the Government explained that the purpose of its efforts was "to gather intelligence about al Qaeda, including the status of the Kenyan cell, the points of contact for other al Qaeda cells around the world, as well as any indications of the future terrorist plans of al Qaeda." (Resp. at 3.) The searches yielded important foreign intelligence information. The electronic surveillance that was conducted revealed that Al Qaeda persons in Kenya "were heavily involved in: providing passports and other false documentation to various al Qaeda associates ...; passing messages to al Qaeda members and associates ...; passing coded telephone numbers to and from al Qaeda headquarters; ... and passing warnings when al Qaeda members and associates were compromised by authorities." (*Id.*) Similarly, the Government asserts that the physical search "recovered documents of great intelligence value from el Hage's computer, including a report in which el Hage's close associate Harun made an explicit admission that the Kenyan cell of Bin Laden's group were responsible for the American military personnel killed in Somalia in 1993." (*Id.* at 4.) The Court is satisfied that the facts presented here, while perhaps suggestive of an investigation that was driven by multiple motives, clearly establish that the primary purpose of the searches at issue was, from start to finish, foreign intelligence collection.

### 3. Authorization from the President or the Attorney General

■ Finally, to apply the exception to the warrant requirement for foreign intel-ligence searches conducted abroad against an agent of a foreign power, the Court must find that the searches in question were directly authorized by the President or the Attorney General.[18] On April 4, 1997 (and again on July 3, 1997), the Attorney General gave her express authorization for the foreign intelligence collection techniques (including the post-April 4, 1997 electronic surveillance and the August 21, 1997 physical search) that were employed. (Resp. at 4.) Based on the Court's *ex parte* examination of the evidence forming the basis for the Attorney General's authorization, it is clear that the decision to conduct searches which targeted El–Hage was reasonable and appropriate. For these searches, then, the exception to the warrant requirement for foreign intelligence surveillance is applicable and the government officials were not required to secure a warrant. The Court will address the only remaining question to be resolved—whether the searches were reasonable—in the Section IV.

■ The electronic surveillance conducted from August 1996 until April 4, 1997 is, however, not embraced by the foreign intelligence exception to the warrant requirement. The Government does not rely on the foreign intelligence exception[19] and seeks, instead, to distinguish the pre-authorization surveillance by emphasizing that it was directed at the activities of al Qaeda, generally, and not at El–Hage. In the Government's words, although "incidental" interception of El–

---

18. In all of the cases finding a foreign intelligence exception to the warrant requirement, the authorization of the President or Attorney General had been obtained and was part of the basis for each court's decision. *See Clay,* 430 F.2d at 166; *Brown,* 484 F.2d at 426; *Butenko,* 494 F.2d at 605. In fact, in several cases, searches undertaken without specific Attorney General or Presidential authorization were deemed to have exceeded the narrow scope of the exception. *See Truong,* 629 F.2d at 917 (stating, with respect to one package search, that "[b]ecause the government agents did not receive executive authoriza-tion, the foreign intelligence exception to the warrant requirement does not legitimate this search"); *Ehrlichman,* 546 F.2d at 925, 927–28 (finding that foreign intelligence exception to the warrant requirement was not available where there was no "specific authorization by the President or the Attorney General" for the searches in question).

19. The Government is aware that application of the foreign intelligence exception requires explicit authorization from the President or Attorney General. (Resp. at 27.)

Hage was "anticipated," he was not the "target" of the collection. (Resp. at 53–55.) For that reason, the Government believed that its only constitutional obligation was to "minimize interception of el-Hage." (*Id.* at 53.) It is on this basis that the Government suggests that no Fourth Amendment violation occurred. The Defendant vehemently disagrees with the Government's position and argues that the fact that his home and cellular phones were among the five lines tapped vitiates any claim by the Government that interception of his phone calls was merely "incidental." (El–Hage Reply at 27.) The Government justifies its characterization by explaining that "The Fedha Estates Premises" was an "al Qaeda safehouse," where individuals linked to al Qaeda could stay when passing through Nairobi. (Resp. at 3, 53.) In addition, the Government emphasizes that the home and cellular phones were available for "communal use" by numerous individuals including many "persons affiliated with al Qaeda." (*Id.* at 52.)

 The Government properly asserts that in the Title III context, incidental interception of a person's conversations during an otherwise lawful surveillance is not violative of the Fourth Amendment. *See United States v. Figueroa,* 757 F.2d 466 (2d. Cir.1985); *United States v. Tortorello,* 480 F.2d 764 (2d Cir.1973). The Supreme Court has held that under certain circumstances a person can even be incidentally intercepted on one's own home telephone. *See United States v. Kahn,* 415 U.S. 143, 157, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974) (holding that where wife's criminal activities were not foreseen when wiretap order (targeting husband) was procured,

interception of her conversations on her home telephone was incidental and did not violate Fourth Amendment). Likewise, officials may also tap a telephone when that particular phone is known to be used for criminal purposes even where they are unable to identify any particular user of the phone. *See Figueroa,* 757 F.2d at 470–71. These cases recognize that in large scale investigations the government is often not in a position of omniscience regarding who or what a particular surveillance will record and, therefore, they hold that the government is not required to predict all possible scenarios in its wiretap requests.

In the cases which have rejected the Fourth Amendment claims of an incidental interceptee, though, the term "incidental" appears to be reserved for those situations where, at the time the wiretap order was sought, either the identity or the actual involvement of the interceptee was not known. *See Kahn,* 415 U.S. at 157, 94 S.Ct. 977 (determining that wife's involvement in husband's criminal activity was unknown in advance); *Figueroa,* 757 F.2d at 472–73 (holding that wiretap order authorizing interception of conversations of "others as yet unknown" was lawful); *Tortorello,* 480 F.2d at 775 ("[S]ince the identity of all persons who may contact or be contacted by the suspect usually cannot be known, it is permissible to record pertinent conversations involving parties not named in the interception order."); *United States v. Sklaroff,* 323 F.Supp. 296, 325 (S.D.Fla.1971) ("[O]fficers wishing to wiretap a telephone believed to be used by certain identified suspects cannot know the identity of all persons who may telephone, or be telephoned, by those suspects.").[20]

**20.** The Government relies on several cases for the more broad proposition that if government agents have probable cause to intercept the conversations of one participant in a conversation, they may lawfully intercept "the statements of the other participants ... if pertinent to the investigation." *Tortorello,* 480 F.2d at 775 (2d Cir.1973); *Figueroa,* 757 F.2d at 475 (same); *United States v. Scott,* 516

F.2d 751, 755 (D.C.Cir.1975) (permitting more extensive electronic surveillance "where at least one party [to a conversation] is a suspected participant in the criminal conduct"). However, the courts issuing these decisions each highlighted that this rule is generally premised on the fact that the government is not in a position to identify, at the outset of a surveillance, all of the people who

 The Government asks the Court to apply this doctrine to the facts presented here and to find that, although the Government clearly foresaw the interception of El–Hage's conversations and suspected his involvement with al Qaeda, the interception was nonetheless incidental. (Resp. at 53–54.) The Government asserts, and the Court agrees, that in light of the Supreme Court decision in *Verdugo–Urquidez,* the Government was not required to get a warrant or to secure Executive authorization before conducting electronic surveillance of the noncitizen al Qaeda associates who used the home and cellular phones. *See Verdugo–Urquidez,* 494 U.S. at 265, 110 S.Ct. 1056 (holding that the Fourth Amendment does not apply to aliens outside the United States). From there, the Government urges the Court to find that the *Verdugo–Urquidez*-based authority to conduct that electronic surveillance "does not dissipate merely because there is an expectation that a citizen who is not targeted will be intercepted." (Resp. at 54–55.) The Court acknowledges that the combination of *Verdugo–Urquidez* and the incidental interception cases outlined above would permit the surveillance if the Government had not been aware of El–Hage's identity or of his complicity in the enterprise. Extension of the doctrine to a case such as this, however, where El–Hage was suspected of involvement with al Qaeda and was a known and contemplated interceptee of electronic surveillance of his home and cellular phones (even if he was not officially

deemed a target), is significantly more problematic.

Recognizing this, the Government urges the Court to adopt a broader definition of "incidental." (Resp. at 54–55.) To that end, the Government relies on several cases for the proposition that incidental does not necessarily mean unanticipated. *See id.* (citing to *United States v. McKinnon,* 721 F.2d 19, 22–23 (1st Cir.1983) ("[S]omething does not have to be unanticipated in order to be incidental."); *United States v. Levine,* 690 F.Supp. 1165, 1171 (E.D.N.Y.1988) (same)). But these cases address the collection of evidence of *crimes* which were "incidental" to those specified in the wiretap order and do not apply that definition of incidental to new *persons* exposed by the surveillance. To expand the definition of an "incidental" interceptee past what has been adopted by previous decisions is not appropriate in this case. It is the Court's view that, given the Government's suspicions about El–Hage's connection to al Qaeda, to say that al Qaeda was the target is merely to say that El–Hage was one of many targets of the surveillance.

Ultimately, the Court holds that with respect to the electronic surveillance of the home and cellular phones,[21] El–Hage was not intercepted "incidentally" because he was not an unanticipated user of those telephones and because he was believed to be a participant in the activities being investigated. The Court finds that El–Hage had a reasonable expectation of privacy in his home and cellular phones[22] and

may be implicated by the surveillance. The emphasis in the caselaw on differentiating between known and unknown participants is in large part due to Title III's requirement that a law enforcement officer seeking a wiretap order provide to the judge the "identity of the person, if known, committing the offense and whose communications are to be intercepted." 18 U.S.C. § 2518(1)(b)(iv).

**21.** Because the Court finds in the next section of the opinion, that the exclusionary rule cannot be applied to this case, El–Hage's reasonable expectation of privacy on the other phone lines is not discussed.

**22.** The Government suggests that El–Hage's expectation of privacy was not reasonable. The Government asserts that because El–Hage spoke cryptically in his phone calls and because one associate expressed concern that the phone was tapped, his expectation of privacy was reduced. *See* Resp. at 52 n. 21 (citing *United States v. Hall,* 488 F.2d 193, 198 (9th Cir.1973))("It would be absurd to hold that one is constitutionally protected from untoward results when he makes statements at a time when he has reason to know that some third party is, or probably is, listening."). *But see* El–Hage Reply at 27 ("Mr.

the Government should have obtained approval from either the President or the Attorney General before undertaking the electronic surveillance on those phone lines in August 1996.[23]

## III. The Exclusionary Rule

■ Despite the fact that this electronic surveillance was unlawful, the Court finds that exclusion of this evidence would be inappropriate because it would not have the deterrent effect which the exclusionary rule requires and because the surveillance was undertaken in good faith. Many of the facts upon which the·Court's conclusions are based involve presently classified material. Those classified facts and the conclusions drawn therefrom are reviewed in Classified Appendix B. The Court hereby directs the Government to institute proceedings to declassify Appendix B. *See supra* n. 1. This section outlines the legal precedents and the general conclusions which form the basis of the Court's decision.

### A. Deterrence

As set forth by the Supreme Court in *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), the exclusionary rule prohibits the use of "evidence secured through an illegal search and seizure." *Wolf v. People of Colorado,* 338 U.S. 25, 28, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949). *Accord Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), extends *Weeks* to prevent police from using the fruits of illegally seized evidence. *See id.* at 392, 34 S.Ct. 341.

■ As scores of cases since *Weeks* have articulated, the main purpose of the exclusionary rule is deterrence. *See, e.g., Elkins v. United States,* 364 U.S. 206, 217, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960) ("The rule is calculated to prevent, not to repair."); *Mapp,* 367 U.S. at 648, 81 S.Ct. 1684 (characterizing the exclusionary rule as a "clear, specific, and constitutionally required ... deterrent safeguard"); *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) (reiterating that the exclusionary rule's "prime purpose is to deter future unlawful police conduct"); *Pennsylvania Bd. of Probation*

---

El–Hage's expectation of privacy in his telephone communications in Kenya was *absolute* in light of Kenya's complete prohibition on wiretapping."). It is also suggested that El–Hage's expectation of privacy was diminished because he lived in another country. *See* Resp. at 52 n. 21. Finally, the fact that El–Hage allowed al Qaeda associates to stay at his home is said to have reduced his expectation of privacy. *But cf. Minnesota v. Olson,* 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990) (affording Fourth Amendment protection to an overnight guest because he had a reasonable expectation of privacy in the residence that was searched). These considerations, while relevant, do not sway the Court's finding that El–Hage had a reasonable expectation of privacy in his home and cellular phones. *See Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The conclusion that he did have a reasonable expectation of privacy seems unassailable, in light of both the doctrinal holding of *Katz* and its factual predicate—the defendant's telephone conversations (deemed worthy, by the Court, of Fourth Amendment protection) occurred in a public phone booth.

**23.** The Court does not extend this holding beyond the particular facts of this case where the Defendant was intercepted on his home and cellular phones. In addition, the Court does not take issue with the policies and procedures developed by the Executive Branch for foreign intelligence collection abroad. These are outlined in Executive Order 12,333, which was issued by President Reagan on December 4, 1981. In Section 2.5 of that order, the President delegates to the Attorney General:

the power to approve the use for intelligence purposes, within the United States or against a United States person abroad, of any technique for which a warrant would be required if undertaken for law enforcement purposes, provided that such techniques shall not be undertaken unless the Attorney General has determined in each case that there is probable cause to believe that the technique is directed against a foreign power or an agent of a foreign power.

*and Parole v. Scott*, 524 U.S. 357, 363, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998) ("[B]ecause the [exclusionary] rule is prudential rather than constitutionally mandated, we have held it to be applicable only where its deterrence benefits outweigh its 'substantial social costs.' "). As the Second Circuit explained in *Ajlouny*, "the Court, in recent years, has refused to apply the rule to situations where it would achieve little or no deterrence." 629 F.2d at 840.

In this case, the Court believes that second-guessing the decisions made by the officials who conducted the electronic surveillance before April 4, 1997, would not further the deterrent purposes of the exclusionary rule. The Second Circuit has explained that the deterrent application of the exclusionary rule requires an assessment of the motives of the government officials who unlawfully acquired the evidence. *See Tirado v. Commissioner of Internal Revenue*, 689 F.2d 307, 311 (2d Cir.1982) ("[T]he deterrence rationale ... is not served by applying the rule to exclude evidence from a proceeding where the evidence was not seized with the participation or collusion of, or in contemplation of use by, agents responsible for the proceeding in which the evidence is presented."). Under *Tirado*, a district court must evaluate the relationship between the "seizing officers' 'zone of primary interest' " and "the nature of the proposed use" of the evidence. *Id.* at 311.

The Court is satisfied that the goal of the intelligence collection, "to neutralize the Bin Laden threat to national security" (Resp. at 65), overwhelmingly dominated the electronic surveillance conducted prior to April 4, 1997. There was no FBI participation in that surveillance (Surreply at 8 n. 3) and the Court believes that the surveillance would have been conducted even if there had been an awareness that the material recorded would be inadmissible at a future criminal trial of El–Hage. (Resp. at 66.) *See United States v. Janis*, 428 U.S. 433, 453–54, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976) (explaining that if the

exclusionary rule does not result in "additional marginal deterrence," then it is not worth the "cost to society of extending the rule"). Although El–Hage suggests that suppression would have the effect of deterring the Government "from improperly merging 'foreign-intelligence gathering' and criminal investigations" (El–Hage Reply at 40), the Court did not find that there was any evidence of an impermissible merger in this case. In addition, unless the cooperation between the government agencies is "undertaken in bad faith to avoid constitutional restraints upon criminal law enforcement," the Supreme Court has cautioned, in a similar case, that the exclusionary rule should only be applied "to the extent that it would be in the public interest to deter and prevent such cooperation." *Abel v. United States*, 362 U.S. 217, 240, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960) (addressing cooperation between INS and FBI).

**B. Good Faith**

 One offshoot of the deterrence analysis has been the development of an exception to the exclusionary rule that is derived from the "good faith" of the officials involved in a particular search. In *United States v. Leon*, 468 U.S. 897, 922, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the Supreme Court introduced the good faith exception in the case of an invalid warrant. *See id.* at 922, 104 S.Ct. 3405. Contrary to the Defendant's suggestion that the good faith doctrine is limited to searches conducted pursuant to a warrant (*see* Reply at 39) the good faith exception has been expanded, since *Leon*, to cases involving warrantless searches. *See Illinois v. Krull*, 480 U.S. 340, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987) (holding officials' good faith reliance on statute authorizing warrantless searches, which was subsequently declared unconstitutional, was objectively reasonable and suppression was therefore unnecessary); *Ajlouny*, 629 F.2d at 840 (declining to apply exclusionary rule in case where officers undertook warrantless for-

eign intelligence search with the good faith believe that their conduct was lawful).

For reasons which are largely outlined in Classified Appendix B, the Court does not accept the Defendant's assertion that the Government's claim that the interception was incidental is a "transparent contrivance designed [to] deflect attention from the fact that Mr. El–Hage was a target of the wiretap, and to avoid the consequences of *not* having appropriate authorization to conduct that electronic surveillance." (Reply at 27.) At the time the surveillance in this case was undertaken, there was no clear precedent in this area to guide the actions of government officials. *See Ajlouny*, 629 F.2d at 841. The Court is persuaded that the officials who conducted the electronic surveillance operated under an actual and reasonable belief that Attorney General approval was not required prior to April 4, 1997, when El–Hage was specifically identified by the Government as a target of foreign intelligence collection. *See United States v. Peltier*, 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975) ("[E]vidence ... should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment."); *Michigan v. Tucker*, 417 U.S. 433, 447, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974) ("The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct."). The surveillance was also conducted in a good faith attempt to conform to the Government's perception of what the law allowed. The Court finds that the officials' interpretation of the caselaw which informs this analysis was reasonable even if in the end it was incorrect. Therefore, the exclusionary rule should not be applied. *See*

*Ajlouny*, 629 F.2d at 841 ("The apparent good faith of those who authorized the electronic surveillance ... also tends to undercut any deterrence that might be achieved by application of the exclusionary rule.").

## IV. The Reasonableness Requirement

■ Even if the Government was not required to secure a warrant in advance of the searches, the Fourth Amendment still requires that the searches be reasonable. El–Hage argues that the search of his home was unreasonable because of the "paramount Fourth Amendment interests in the sanctity of the home." (Reply at 32.) In addition, he asserts that the electronic surveillance was unreasonable because it was conducted "continuously and without interruption" for a full year. (El–Hage Mot. at 10.) These allegations are considered in turn.

### A. The Physical Search of the Residence

■ All of the cases which have established the existence of a foreign intelligence exception to the warrant requirement (and which are relied upon by the Government) arose in the context of electronic surveillance.[24] El–Hage also notes, correctly, that "[n]one of the other 'foreign intelligence-gathering' cases involved a residential search." Reply at 32 n. 22. It is therefore necessary to assess whether the precedents reviewed apply with equal force to a physical search of the home.

The proposition that searches of the home have always merited rigorous Fourth Amendment scrutiny is unassailable. *See, e.g., Payton*, 445 U.S. at 590, 100 S.Ct. 1371 "([A]bsent exigent circumstances, [the threshold of the home] may not be reasonably crossed without a warrant."); *Keith*, 407 U.S. at 313, 92 S.Ct. 2125 (char-

---

**24.** *Truong* also included a physical searches of several packages which were, like the electronic surveillance, exempted from the warrant requirement. *See* 629 F.2d at 917 n. 8. In *Ehrlichman*, 546 F.2d 910, 924–25 (D.C.Cir.1976) and in the related case of *United States v. Barker*, 546 F.2d 940, 949–51 (D.C.Cir.1976), the D.C. Circuit considered but did not apply the foreign intelligence exception in the case of an office break-in.

acterizing "physical entry of the home" as the "chief evil against which the wording of the Fourth Amendment is directed"). At the same time, numerous cases have emphasized the highly intrusive nature of electronic surveillance. *See Berger v. State of New York*, 388 U.S. 41, 63, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967) (describing electronic eavesdropping as an invasion of the "innermost secrets of one's home or office" and stating that "[f]ew threats to liberty exist which are greater than that posed by the use of eavesdropping devices"); *United States v. Nicholson*, 955 F.Supp. 588, 591 (E.D.Va. 1997) ("Fourth Amendment jurisprudence regards physical entry and electronic surveillance on an even plane, with each subject to the reasonableness requirement of the Fourth Amendment."); *Zweibon v. Mitchell*, 516 F.2d at 632 ("[B]oth the spirit and the history of [the Fourth] Amendment demonstrate that there is a legitimate expectation that one's conversations no less than one's home are to be sheltered by the full panoply of Fourth Amendment safeguards."); *United States v. Smith*, 321 F.Supp. 424, 425–426 (C.D.Cal.1971) ("Electronic surveillance is perhaps the most objectionable of all types of searches in light of the intention of the Fourth Amendment."). These cases, considering the relative intrusiveness of residential searches and electronic surveillance, generally seem to conclude that neither automatically merits greater protection from the Fourth Amendment. *See Katz v. United States*, 389 U.S. 347, 353–54, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (steering Fourth Amendment jurisprudence away from overemphasis on "physical intrusion" and toward the protection of "people—and not simply 'areas'").

Although the Defendant suggests that courts only permit warrantless residential searches in cases of exigency, several cases have permitted home entries, without warrants, where a special need of the government is shown. *See Griffin*, 483 U.S. 868, 107 S.Ct. 3164; *McCabe v. Life–Line Ambulance Service*, 77 F.3d 540 (1st Cir.1996). For these reasons, the Court finds that the foreign intelligence exception to the warrant requirement applies with equal force to residential searches. El–Hage's argument that the search of his residence was *per se* unreasonable is therefore rejected.

 In addition, the limited scope and overall nature of the search indicate that the search was executed in a reasonable manner and was not, as El–Hage alleges "conducted as if pursuant to a 'general warrant.'" (El–Hage Surrebuttal at 12.) The Government and the Defendant both state that the search was conducted during the daytime, an inventory of the items seized was left at the residence and that an American official was present for the search (and "identified himself ... in true name"). (Resp. at 4.) The scope of the search was limited to those items which were believed to have foreign intelligence value and retention and dissemination of the evidence acquired during the search were minimized.[25] (Resp. at 61.) Therefore, the items seized during the physical search of El–Hage's Kenya residence are not suppressed.

## B. The Electronic Surveillance

 The Defendant argues that the electronic surveillance undertaken in this case is unreasonable because there were no reasonable durational limits on the surveillance: "the Government continuously and without interruption intercepted any and all of Mr. El–Hage's and his family's telephone conversations and facsimiles from July 1996 through September 1997."

---

**25.** The Defendant suggests that even if the warrantless seizure of his computer was reasonable, the Government should have obtained a warrant before searching the computer. (Reply at 22.) Given that it was the *contents* of the computer that were believed to have foreign intelligence value, the Court finds that the exception extends to the search of the computer files and the Government was not required to secure a warrant before searching the computer.

(El–Hage Mot. at 10.) Although the excessive length of an electronic surveillance can be a factor tending toward unreasonableness, courts will consider the duration and the continuity within the context of a particular case. As the Government notes, more extensive monitoring and "greater leeway" in minimization efforts are permitted in a case like this given the "worldwide, covert and diffuse nature of the international terrorist group(s) targeted." (Resp. at 59.) *Cf. United States v. Clemente,* 482 F.Supp. 102, 107 (S.D.N.Y.1979) (allowing more extensive electronic surveillance where "alleged scope of defendants' activities is truly massive"); *United States v. Scott,* 516 F.2d 751, 758 (D.C.Cir.1975) (finding, in case regarding the activities of a "fairly extensive narcotics business" that "thorough surveillance … was necessary to disclose the extent of [the] conspiracy and the identity of the conspirators"); *United States v. Hoffman,* 832 F.2d 1299, 1308 (1st Cir.1987) ("Where, as here, an investigation is focused largely on blueprinting the shape of the conspiratorial wheel and identifying the spokes radiating from its hub, the need to allow latitude to eavesdroppers is close to its zenith.").

In addition, the Government emphasizes that the recorded conversations were conducted in a foreign language and that there was a high likelihood that some of the seemingly innocuous conversations were in code. (Resp. at 59.) *See United States v. Gotti,* 42 F.Supp.2d 252 (S.D.N.Y. 1999) ("[M]ore extensive surveillance may … be permitted, if the investigation focuses on a widespread conspiracy."); *Truong,* 629 F.2d at 916–17 ("When the government eavesdrops on clandestine groups like this one, investigators often find it necessary to record possible code language or oblique references to the illegal scheme."); *United States v. Hoffman,* 832 F.2d 1299, 1308 (1st Cir.1987) (same); *United States v. Hovsepian,* 1985 WL 5970, at *4 (C.D.Cal.1985) (foreign language and coded conversations justified automatic recording of all conversations); *Matter of Kevork,* 634 F.Supp. 1002, 1017

(C.D.Ca.1985) (same); *United States v. Scott,* 516 F.2d 751, 758 (D.C.Cir.1975) (allowing more extensive surveillance where conspirators spoke in code and began conversations with discussion of irrelevant matters). The Government minimized the electronic surveillance by limiting the conversations for which verbatim transcripts were prepared and by disseminating the Defendant's name only where necessary for foreign intelligence purposes. (Resp. at 59.) *See Matter of Kevork,* 634 F.Supp. 1002, 1017 (C.D.Ca.1985) ("[M]inimization may occur at any of several stages, including recording, logging, indexing, or dissemination.").

Finally, the Government's surveillance was reasonable in light of the use to which the telephones in question were put. *See United States v. Scott,* 516 F.2d 751, 759 (D.C.Cir.1975) ("The actual use of the telephones is at least as relevant to the question of the level of surveillance which is reasonable as is their physical location."). Here the Government's assertion that these were "communal" phones which were regularly used by al Qaeda associates is highly relevant. (Resp. at 52.) For these reasons this Court finds that the automated recording of the phone lines was not unreasonable.

## V. Suppression Hearing

 The Court has resolved the matters raised by the Defendant's motion without holding a suppression hearing. The Supreme Court has confirmed the validity of *in camera, ex parte* review. *See Taglianetti v. United States,* 394 U.S. 316, 317–18, 89 S.Ct. 1099, 22 L.Ed.2d 302 (1969) (determining that the Court does not require "an adversary proceeding and full disclosure for resolution of every issue raised by an electronic surveillance" and finding that, in that case, the task was not "too complex … to rely wholly on the *in camera* judgment of the trial court"); *Giordano v. United States,* 394 U.S. 310, 313, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969)

(explaining that a district court does not have to hold an adversary hearing to determine the lawfulness of a surveillance). *See also United States v. Belfield,* 692 F.2d 141, 149 (D.C.Cir.1982) ("In this circuit and in others, it has constantly been held that the legality of electronic, foreign intelligence surveillance may, even should, be determined on an *in camera, ex parte* basis.").[26]

▇ Several courts have specifically cautioned that *ex parte, in camera* review should only be used where necessary. *See, e.g., United States v. Butenko,* 494 F.2d 593, 607 n. 78 (3d Cir.1974) ("Ex parte, *in camera* resolution of dispositive issues should be avoided whenever possible."); *United States v. Southard,* 700 F.2d 1, 11 (1st Cir.1983) ("Ex parte, *in camera* hearings are part of a trial judge's procedural arsenal but, of course, should only be used when necessary."). In light of the Government's persuasive arguments about "ongoing threat posed by al Qaeda" and the potentially damaging impact of disclosure on existing foreign intelligence operations, (Resp. at 73–74), the Court was persuaded of the need for *in camera, ex parte* review of the sensitive material in the case.[27] In addition, the issues raised by El–Hage's motion were predominantly legal questions and the fact-based inquiry was limited, so the benefit of holding an adversary hearing was substantially lessened. *See United States v. Ajlouny,* 629 F.2d 830, 839 (2d Cir.1980) (quoting *Alder-man v. United States,* 394 U.S. 165, 183–84, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969)) (holding that where district court had not been called on to conduct a "painstaking search through 'a large volume of factual materials,'" issues regarding lawfulness of electronic surveillance were properly resolved without an adversary hearing).

The most significant factual question centered on the nature of the searches (whether they were conducted for foreign intelligence purposes or law enforcement purposes). *See Ajlouny,* at 839 (relying on *in camera* review of the records at issue to discern the primary purpose of the surveillance at issue and to evaluate the reasonableness of its scope). This question was not overly complex and its resolution required that the Court review a limited (and manageable) number of documents. *See Alderman,* 394 U.S. at 183–84, 89 S.Ct. 961 (explaining that "the need for adversary inquiry is increased by the complexity of the issues presented for adjudication"). All of the other issues that required consideration were legal questions which, thoroughly briefed by the parties, did not require an adversary hearing. Based on Government's assertion that disclosure of the *ex parte* materials would jeopardize the ongoing investigation of al Qaeda and in light of the limited factual inquiry that was necessary to resolve the issues presented, the Court determined that a hearing was unnecessary.

---

26. Although the searches that were conducted in Kenya are not governed by FISA, it is worth noting that *ex parte, in camera* review is a part of the FISA framework. *See* 50 U.S.C. § 1806(f) (providing for *in camera* and *ex parte* review by a district court "if the Attorney General files an affidavit under oath that disclosure or an adversary hearing would harm the national security of the United States" and permitting disclosure only where "necessary to make an accurate determination of the legality of the surveillance"). *See United States v. Ott,* 827 F.2d 473, 475 (9th Cir.1987)(affirming these FISA procedures).

27. Defense counsel's assertion that, given their security clearance, they ought to have access to the sensitive documents is not persuasive to the Court. As the Government explains those security clearances enable El–Hage's attorneys to review classified documents, "but they do not entitle them to see all documents with that classification." Resp. at 72 n. 31. *Cf. United States v. Ott,* 827 F.2d 473, 477 (9th Cir.1987) (explaining, in the FISA context, that "Congress has a legitimate interest in authorizing the Attorney General to invoke procedures designed to ensure that sensitive security information is not unnecessarily disseminated to anyone not involved in the surveillance operation in question, whether or not she happens for unrelated reasons to enjoy security clearance.").

## CONCLUSION

For the foregoing reasons, El–Hage's motion to suppress evidence from the physical search of his Kenya residence and electronic surveillance is denied without a hearing.

SO ORDERED.

### Declassified Appendix A

As outlined in the opinion, the Court finds that the search of El–Hage's residence was undertaken primarily for the purpose of foreign intelligence collection. The mere fact that FBI Agent Coleman [*redacted*] was present during the residential search does not mean that law enforcement displaced foreign intelligence collection as the primary purpose of the search. Coleman's presence was intended to ensure that "if anything of evidentiary value for law enforcement was found, [he] could testify to a chain of custody without involving covert [*redacted*] employees." ([*Name redacted*] Decl. ¶ 65.) Although [*redacted*] has, at times, "attempted to accommodate law enforcement ... the primary focus has been collection, disruption, and dissemination of intelligence" on Bin Laden and his organization. (*Id.* ¶ 38.) The intelligence objective, [*redacted*] was at all times overriding, (*Id.* ¶ 59.) It was also believed that evidence gleaned from El–Hage's computer would provide [*redacted*] "insight into the Bin Laden infrastructure." (*Id.*) The Government's assertion that [*redacted*] actions were primarily for the purpose of foreign intelligence collection is reinforced by the fact that foreign intelligence collection against Bin Laden and al Qaeda "continues today." (*Id.* ¶ 38.) As is clear from the [*name redacted*] Declaration, the search of El–Hage's residence yielded important intelligence information about Bin Laden's organization. (¶ 67) Finally, in disseminating the information discovered during the search, [*redacted*] followed minimization procedures (*Id.* ¶ 68).

### Declassified Appendix B

The foregoing analysis, *see supra* Section III, concludes that although the electronic surveillance conducted prior to obtaining the Attorney General's authorization (April 4, 1997) was violative of the Fourth Amendment, exclusion would not be the appropriate remedy for such a violation. In addition to the facts outlined in the opinion as the basis for the determination, the Court has also relied on the following facts drawn from the Government's classified submissions of October 2, 2000 and November 21, 2000.

The Court's conclusion that the Government should have secured Attorney General approval before commencing the surveillance was premised on the fact that El–Hage could not properly be characterized as an "incidental" interceptee. While most of the basis for the conclusion was outlined in the text of the opinion, there were at least three pieces of information relied on by the Court which were drawn from the classified submissions. First, in July 1996, before any surveillance was undertaken [*redacted*] was aware that # 820067 was "registered with the local phone company in el Hage's name." (Letter from [*name redacted*] to AUSA Fitzgerald of 11/21/2000 ¶ 3.) Second, before any electronic surveillance was undertaken, the Government determined that "the intelligence value of targeting El–Hage directly would be significant." ([*Name redacted*], Decl. ¶ 44.) Finally, before electronic surveillance of the cellular phone # 071–202219 was undertaken, it was known that El–Hage sometimes used that phone and he was initially identified as one of the "proposed targets" of the surveillance. (*Id.* ¶ 49.)

Nevertheless, as explained in the opinion, the Court finds that exclusion of the evidence derived form these surveillances would not be appropriate both because of the limited deterrent effect of such an exclusion and because of the Court's belief that the agents conducting the surveillance acted in good faith. The basis for the

deterrence argument is wholly incorporated into the main text. *See supra* Section III.A. The basis for the good faith argument, however, relies in part on the contents of some of the government's classified submissions.

Perusal of the contemporaneous communications among the Government agents [*redacted*] and their superiors [*redacted*] discloses the following:

1) There was an awareness that El-Hage, who was believed to be an important agent of Bin Laden, was an American citizen and that he could not be targeted for surveillance absent authorization form the Attorney General. [*Redacted*]. Advice was sought from [*redacted*] General Counsel regarding whether electronic surveillance could be conducted on telephones which were registered in El-Hage's name but were believed to be used by a number of Bin Laden associates who used El-Hage's residence as a guesthouse. (*Id.* ¶ 2.)

2) The General Counsel advised that any interception of El-Hage as a result of general surveillance of al Qaeda for intelligence purposes would be 'incidental' and permissible absent Attorney General authorization. (*Id.*)

 a) El-Hage was not to be the specific target of the surveillance. [*Redacted*]

 b) Interceptions of El-Hage which were not related to intelligence gathering were not to be retained. [*Redacted*]

 c) Minimization rules would apply to any El-Hage interception; his name and other data concerning him were to be redacted from any retained documentation unless necessary for foreign intelligence purposes. (*Id.; see also* [*name redacted*] Decl. ¶ 46.)

These rules were apparently in force until late winter when it was concluded that El-Hage should be regarded as a target and Attorney General Authorization was sought. (Letter from DCI Tenet to AG Reno of 4/3/1997.)

The advice of the General Counsel appears to have been based on guidelines which were published in [*redacted*]. (*See* [*name redacted*] Decl.¶ 16.) [*Redacted*] adopted by the DCI and the Attorney General pursuant to Executive Order 12,-333, governs the "[c]ollection of intelligence on U.S. persons that takes place outside the United States." (*Id.*) [*Redacted*] provides that "incidental collection by electronic surveillance of information on a U.S. person outside the U.S. is permitted without [Attorney General] approval." (*Id.* ¶ 19.)

 ██ What emerges from the foregoing is the fact that the Government proceeded with caution in the belief, fortified by the opinion of counsel, that its actions were entirely lawful. Obviously, reliance on the opinion of [*redacted*] counsel does not immunize clearly illegal action. General counsel's advice is not equivalent to the views of a disinterested magistrate. But the fact that counsel, removed from those in the field, sanctioned the actions taken is a relevant consideration.

Moreover, as the Court highlighted in the text of the opinion, the determination of what interception would be legally regarded as "incidental" in the context of this case is not amenable to an easy answer. This is because of the perceived nature of the premises and the suspected use to which the telephones were being put. From several of the Government submissions, it is clear that # 820067 (El-Hage's home phone number) was believed by those undertaking the surveillance to be "an important nexus of Bin Laden's activities." [*Redacted*] The Fedha Estates premises was characterized as a Bin Laden guesthouse and the Government believed that the residential telephone line was, at least in part, maintained for the use of persons who stayed at the guesthouse. [*Redacted*] This belief was reinforced by the electronic surveillance itself; the Government found that El-Hage came on the line "about 60 percent of the time, often merely to answer the phone and to

provide it to some other Bin Laden guest-house user requested by the caller." (*Id.* ¶ 5) It is clear from these accounts that the Government's initial assumptions about the use of the phone were borne out by the evidence accumulated during the surveillance.

The Court is persuaded that the surveillance was undertaken in good faith reliance on a mistaken interpretation of the law. For that reason, as outlined in the opinion, the evidence from the pre-April 4, 1997 electronic surveillance is not suppressed.